217 Kan. 251 (1975)
535 P.2d 881
STATE OF KANSAS, Appellee,
v.
JULIAN BEY, Appellant.
No. 47,731
Supreme Court of Kansas.
Opinion filed May 10, 1975.
Michael Lerner, of Barnett & Lerner, of Kansas City, argued the cause, and was on the brief for the appellant.
Nick A. Tomasic, district attorney, argued the cause, and Curt T. Schneider, attorney general, was with him on the brief for the appellee.
The opinion of the court was delivered by
SCHROEDER, J.:
This is an appeal in a criminal action by Julian Bey (defendant-appellant) from a conviction of first degree murder (K.S.A. 21-3401) while perpetrating the crime of aggravated robbery (K.S.A. 21-3427).
The questions raised on appeal pertain to: (1) the use of transcript testimony of a prosecution witness who testified at the preliminary hearing but was unavailable to testify in person at the trial; (2) the lineup identification procedures; and (3) the sufficiency of the evidence to support the appellant's conviction under the felony-murder rule.
Testimony received at Bey's trial disclosed that on September 11, 1973, John Lomax, Wilbert Etier and appellant drove to the offices of the Prolerized Steel Corporation in Kansas City, Kansas, to commit a robbery. Lomax and Bey entered the office building while Etier waited behind the wheel of the get-away car. As Bey and Lomax entered the office a young man, Roy Lake, ran from the building and shouted that a robbery was taking place. Etier emerged from the driver's side of the waiting automobile and fired his rifle at Lake, resulting in his death.
The appellant was charged and tried for the robbery and the killing. Two men working in the Prolerized Steel office at the time of the robbery, Mr. Richard Glasscock and Mr. Rudy Roth, identified the appellant as one of the robbers. Lomax admitted participating in the robbery and testified for the prosecution. Etier was killed by unknown persons prior to the trial of Bey. According ao Lomax's testimony, Lomax, Julian Bey and Wilbert Etier drove in a blue Pontiac to the Prolerized Steel plant on the morning of September 11, 1973. After arriving Lomax entered the business office and requested a job application but was told they were not hiring. *253 Lomax testified he started to leave the office when the appellant entered the office. The appellant was armed with a shotgun; Lomax had a .32 chrome revolver; and Etier, who stayed with the car, had a rifle and a pistol. Lomax further stated as the appellant was about to enter the office, there was a young man standing just inside the door. When the appellant entered the young man ran out the door. The appellant told Lomax to "stop him," but Lomax just let him go. Once inside Lomax and the appellant ordered the men in the office to lie down and then took money from a drawer and the safe, a total of approximately $500.
When the robbery was completed Lomax and the appellant returned to the car and departed with Etier driving. According to Lomax, as the three were riding in the car, Etier asked why Lomax and the appellant had "let the dude run?", and Etier then stated that he "had to do away with him." Lomax testified that he neither saw nor heard the shooting.
Additional evidence before the jury included a reading of the transcript of one Bobby Arnold's testimony from the preliminary hearing. Arnold was an independent truck driver who was present outside Prolerized Steel's business office at the time of the robbery. He testified that he saw a blue Pontiac parked by the office and observed a white boy walking toward the car when two black men got out of the Pontiac and walked toward the office with the boy. He next saw the boy break away from the two men and start running in Arnold's direction shouting "Holdup run". The two men continued on into the office building. Arnold then saw another black person get out from the driver's side of the Pontiac and fire several shots at the running boy.
Predicated upon the evidence presented the jury found Bey guilty of first degree murder under the felony-murder rule, and he was sentenced to life imprisonment. Bey moved for a new trial. That motion was overruled by the trial court and Bey has duly perfected this appeal.
The appellant contends the trial court erred in refusing to exclude the reading of the preliminary hearing testimony of Bobby Arnold because Arnold was not properly served with a subpoena for appearance at the trial, and that a diligent effort was not made to secure his appearance.
The provisions of K.S.A. 60-460 (c) (2) permit testimony of a witness given at a preliminary examination to be used at the trial *254 only if it is shown that the witness is unavailable to testify personally. K.S.A. 60-459 (g) provides in part that:
"`Unavailable as a witness' includes situations where the witness is ... (5) absent from the place of hearing because the proponent of his statement does not know and with diligence has been unable to ascertain his whereabouts."
This court has considered the admissibility of the testimony of an absent witness given at a preliminary hearing, or at a former trial, on many occasions. In State v. Washington, 206 Kan. 336, 479 P.2d 833, the rule is stated as follows:
"Under the federal constitutional standard as applied to the states, the test of unavailability, for the purposes of the exception to the confrontation requirement, is whether the prosecutorial authorities have made a `good faith effort' to obtain the witness's presence at trial (Barber v. Page, 390 U.S. 719, 20 L.Ed.2d 255, 88 S.Ct. 1318). Consistent with the federal mandate is our long-standing rule that before the state may use the testimony of an absent witness given at a former trial or preliminary hearing, it must be made to appear the witness cannot, by the exercise of reasonable diligence, be produced at trial (State v. Lesco, 194 Kan. 555, 400 P.2d 695; State v. Guthrie, 192 Kan. 659, 391 P.2d 95; State v. Brown, 181 Kan. 375, 312 P.2d 832; State v. Bonskowski, 180 Kan. 726, 308 P.2d 168; State v. Streeter, 173 Kan. 240, 245 P.2d 1177. Also, see K.S.A. 60-459 [g])." (p. 338.)
(See also State v. Kirk, 211 Kan. 165, 505 P.2d 619; State v. Calvert, 211 Kan. 174, 505 P.2d 1110; State v. Ford, 210 Kan. 491, 502 P.2d 786.)
This court has not attempted to define the term "reasonable diligence" with the preciseness that other legal phrases have been characterized. Analysis of our previous decisions establishes that each case turns on its own facts and circumstances to determine the availability of a witness. (State v. Kirk, supra.)
To support its motion requesting the trial court to authorize the reading of the transcribed testimony of Arnold at the preliminary hearing to the jury, the state called Joseph A. Horvat, an investigator in the Wyandotte County district attorney's office, to testify concerning efforts he made to contact Arnold for the trial.
According to Horvat following the preliminary hearing, he and the district attorney talked with Arnold to verify the fact that he would be available to testify at the trial. Arnold was cooperative, and gave his street address in Marshall, Missouri, and his phone number.
In preparing for the trial the investigator issued a subpoena to Arnold at the given address on January 8 (trial commenced on January 14). After learning the subpoena was not served, the investigator *255 attempted to telephone Arnold at the number given but the line had been disconnected. An officer of the Marshall, Missouri, police department was then contacted and asked for assistance in locating Arnold. The Marshall police officer learned that Arnold no longer lived in Marshall but had moved to Fair Play, Missouri, which is located in Polk County.
Through directory assistance the investigator obtained a phone number for Arnold, but he was unable to get an answer when he called, so the aid of the Polk County sheriff's office was solicited. A deputy from the Polk County sheriff's office drove to Arnold's residence on several occasions over a five day period. He left a note on one occasion directing Arnold to contact the Wyandotte County district attorney or the sheriff's office, and the note apparently was picked up but Arnold did not contact any of the authorities. The Polk County deputy also made numerous telephone calls to Arnold's house but they were never answered.
The investigator also sought assistance from two friends of Arnold's who worked at Prolerized Steel, Arnold's brother and nephew, and others.
The investigator also stated a subpoena was not issued to the sheriff of Polk County to be served upon Arnold.
The appellant objected to the reading of the transcript into evidence on the grounds that the legal requirements for showing unavailability of a witness had not be fulfilled, no subpoena having been issued to Mr. Arnold at his Polk County address.
The appellant was represented at the preliminary hearing by counsel and Arnold was subjected to some cross-examination at that time.
In sustaining the state's motion, the trial court said:
"Well, I believe I would have to find that the County Attorney has made a diligent effort to locate this witness. I think it would probably have been a useless gesture to issue a subpoena to another county to be served when the sheriff down there had been unable to locate or contact the man at all."
In our opinion the trial court was correct in concluding that the issuance of a subpoena to Arnold's Polk County address would have been a useless act in view of the efforts made by the Polk County sheriff's office. Though the state might well have allowed itself more time in which to serve Arnold, Arnold had given the impression of being a willing and cooperative witness and there was no reason to anticipate difficulty in serving him. We think *256 the evidence was sufficient to establish that reasonable diligence had been used by the state in seeking to ascertain the whereabouts of Arnold and to procure his attendance at the trial.
The appellant next argues that his rights to due process were violated by pretrial identification procedures with respect to Rudy Roth, who was employed and present at the office of Prolerized Steel at the time of the robbery.
Four days subsequent to the robbery a lineup comprised of four suspects, including the appellant, was conducted by the Kansas City Police Department and witnessed by Mr. Roth. Roth testified that at this lineup the suspects were requested to speak and make some movement. After viewing the lineup, Roth was unable to positively identify any of the suspects as one of the robbers, though he testified at the trial that he thought he could identify the appellant.
Five days later a second lineup was conducted and Roth was present with Mr. Glasscock, who had been present in the office at the time of the robbery, but had not been present at the first lineup. On this occasion, Roth was able to positively identify the appellant as one of the holdup men, as was Glasscock.
Roth could not account for the fact he was able to identify the appellant during the second lineup but was unable to do so on the first occasion. Roth could not recall whether or not any individuals appearing in the second lineup, other than the appellant, had also appeared in the first, though to the best of his knowledge the appellant was the only individual to appear in both. He testified that when he viewed the second lineup he remembered having seen the appellant in the previous lineup. It should be noted the appellant was represented by counsel at both lineups in accordance with United States v. Wade, 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926, and Gilbert v. California, 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951.
Evidence taken by the trial court on the appellant's motion to suppress the lineup testimony of Roth was not in the presence of the jury. The trial court ruled Roth's testimony concerning the second lineup and his in-court identification of the appellant should be presented to the jury.
The appellant argues the appearance of a single familiar face at the second lineup is a violation of constitutionally fair lineup standards as enunciated in the cases of Stovall v. Denno, 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967 (1967); Foster v. California, *257 394 U.S. 440, 22 L.Ed.2d 402, 89 S.Ct. 1127 (1969); and Neil v. Biggers, 409 U.S. 188, 34 L.Ed.2d 401, 93 S.Ct. 375 (1972).
In Stovall, supra, it was recognized that, judged by the "totality of the circumstances," the conduct of identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law. In Biggers, supra the central question before the court was whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive, and it was stated that factors to be considered in evaluating the likelihood of misidentification include:
"... [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation...." (pp. 199, 200.)
In Stovall and Biggers the court held, upon facts inapposite to those in the case at bar, that due process had not been violated.
In Foster the defendant was placed in a lineup in which he stood out from the other men. There was a contrast by reason of his height and by the fact that he was wearing a jacket similar to that worn by the robber. When this did not lead to an identification the police permitted a one-to-one confrontation between the defendant and the sole witness to the crime. The witness' identification remained tentative and a few days later a second lineup was arranged in which defendant was the only member who had appeared in the first lineup. This finally produced a positive identification. The court, in refusing to hold that the lineup procedure constituted harmless error, stated:
"The suggestive elements in this identification procedure made it all but inevitable that David [the witness] would identify petitioner whether or not he was in fact `the man.' In effect, the police repeatedly said to the witness, `This is the man.' See Biggers v. Tennessee, 390 U.S. 404, 407 (dissenting opinion). This procedure so undermined the reliability of the eyewitness identification as to violate due process." (p. 443.)
The appellant argues that although Roth had ample opportunity to view the two robbers during the crime, he was completely unable to make an identification at the original lineup, and he admitted that nothing in particular caused him to make the identification at the second lineup, all of which suggests that this identification was merely the identification of a familiar face and *258 not the identification of an assailant at the scene of the crime. The appellant asserts that under a fair reading of the totality of the circumstances rule, the circumstances surrounding his identification were suggestive and improper to the extent that his right to due process was violated.
The state's position is that the lineup procedures with respect to witness Roth were not violative of the appellant's due process rights within the cases discussed above, and further that Roth's in-court identification was capable of supplying the requisite identification regardless of any alleged deficiency in pretrial confrontations.
On the basis of the record before us we are unable to conclude that the appellant's constitutional rights were violated. The facts in the instant case do not go to the extreme proportions as they did in Foster, supra; consequently it is not controlling authority that the procedures utilized in this case were impermissibly suggestive.
In the case at bar, Roth's testimony on cross-examination concerning whether or not anyone other than the appellant appeared in both lineups went as follows:
"Q. Can you recall if anybody other than the defendant was in both the first and the second lineups you viewed?
"A. No.
"Q. He was the only one in both those lineups, wasn't he?
"A. Well, as far as I could tell. I can't remember, you know. You mean the same party in both lineups?
"Q. I am saying the same party, that is right.
"A. I really don't know whether there was.
"Q. You don't recall?
"A. I can't recall it, no, whether there was or not.
"Q. To your knowledge, then, the defendant was the only individual who was in both the first and second lineups?
"A. As best I can recall now, yes.
"Q. And when you viewed the second lineup, did you recall having seen the defendant in the first lineup?
"A. Yes.
"Q. And did you recognize anybody else in the second lineup as having been in the first lineup?
"A. Not that I can recall now."
It is obvious from the foregoing testimony that the fact that the appellant appeared in both lineups did not make a significant impression on Roth and he was unsure as to whether other members of the original lineup also appeared in the second one.
*259 We do not agree with the appellant's contention that the fact he may have been the only person appearing in both lineups ipso facto invalidates Roth's identification at the second lineup. Indeed the United States Supreme Court decisions cited by the appellant and discussed above require us to review the "totality of the circumstances," and in so doing we note the appellant was represented by counsel at both lineups; the exhibits before the trial court included a photograph of the second lineup and the height and weight of each suspect was listed on the lineup waiver; there is no contention by the appellant that he stood out from the other three men in the lineup because of any physical contrast; Roth had an ample opportunity to view the robbers at the time of the crime; and both lineups were conducted within nine days of the holdup. While it may be preferable for the authorities to use the same participants in each lineup, that would frequently be impossible due to the fact that the participants other than the primary suspect are usually persons who happen to be in custody at the time of the lineup and they would not be available for any length of time. After personally hearing the testimony the trial court concluded the procedures utilized were not unduly suggestive, and we are not persuaded otherwise.
It should also be noted that in the present case Roth was not the sole witness to the robbery. The appellant was identified by Glasscock, another Prolerized Steel employee, and his accomplice, Lomax.
In addition, it must be pointed out that Roth identified the appellant during the trial as one of the men who robbed the office. This court has held that in-court identifications may be capable of standing on their own even though preceded by deficient pretrial confrontations. (State v. Kelly, 210 Kan. 192, 499 P.2d 1040; State v. Calvert, 211 Kan. 174, 505 P.2d 1110; and State v. Lora, 213 Kan. 184, 515 P.2d 1086.) Under these circumstances, Roth's in-court identification would be sufficient regardless of any alleged deficiency in pretrial confrontations, though Roth's failure to identify the appellant at the first confrontation was properly a basis for cross-examination and jury argument.
The appellant's final point is that the trial court erred in refusing to grant his motion for judgment of acquittal because the evidence was legally insufficient to uphold a conviction under the felony-murder rule (K.S.A. 21-3401).
In a murder committed during the commission of a felony the *260 felonious conduct itself is held tantamount to the elements of deliberation and premeditation which are otherwise required for first degree murder. Therefore, to support a conviction for felony murder all that is required is to prove that a felony was being committed which was inherently dangerous to human life, and that the homicide was a direct result of the commission of that felony. (State v. Reed, 214 Kan. 562, 520 P.2d 1314 and the cases cited therein.)
The appellant argues the felonious conduct must have a factual connection with the conduct which caused the death, and that in this case the state's evidence failed to bring forth a sufficient link between actions taken by the parties inside the office at Prolerized Steel and the actions taken by Etier outside the office which resulted in Roy Lake's death. It is argued that other than the testimony of Lomax there is no clear and convincing proof that the appellant was involved in the perpetration of a felony which had any factual link to Lake's death.
This court has long recognized that uncorroborated testimony of an accomplice is sufficient to sustain a conviction. (State v. Shepherd, 213 Kan. 498, 516 P.2d 945.) The credit to be given such testimony is a matter for the jury's determination. Lomax's testimony discloses that Etier, Lomax and the appellant had conspired to rob the Prolerized Steel office and had driven there together for that purpose on the morning of September 11, 1973. Etier, who was armed with a rifle and a pistol, remained in the driver's seat of the automobile for the obvious purpose of allowing the threesome to make a quick get-away, and also to be on the alert in the event they were discovered. In performing these duties Etier was a participant in the robbery and was as guilty as Lomax and the appellant. (State v. Turner, 193 Kan. 189, 392 P.2d 863; and K.S.A. 21-3205.)
In State v. Turner, supra, it was held that where the evidence disclosed the defendant participated in the commission of a burglary, during which the victim was killed by another participant, the defendant was equally guilty of the murder of the victim, and it was only necessary for the state to produce evidence which tended to connect the defendant with the commission of the crime of burglary, and show that the victim was murdered in the perpetration of such acts. (See also, State v. Boone, 124 Kan. 208, 257 Pac. 739; and State v. Bundy, 147 Kan. 4, 75 P.2d 236.)
Furthermore in The State v. Roselli, 109 Kan. 33, 198 Pac. 195, *261 it was held that if, in the execution of a common purpose of two persons to rob, one of them murders the victim, the other is guilty of murder.
Accordingly we conclude Etier's murder of Lake was in furtherance of the threesome's common design to rob the office. Etier remained in the get-away vehicle armed with a rifle and a pistol which shows he was expected to prevent any exposure of the crime being committed inside the office, and the shooting of Lake who discovered the robbery was a natural and probable consequence of the common purpose.
The judgment of the lower court is affirmed.
FROMME, J., not participating.