(566 P.2d 38)

No. 48,501

JULIAN BEY, *Appellant.* v. THE STATE OF KANSAS, *Appellee.*

Petition for review denied September 8, 1977.

Opinion filed July 1, 1977.

*Thomas E. Osborn,* of Kansas City, for appellant.

*Dennis L. Harris,* assistant district attorney, *Curt T. Schneider,* attorney general, and *Nick A. Tomasic,* district attorney, for appellee.

Before PARKS, P.J., FOTH and REES, JJ.

REES, J.: This is an appeal from a ruling by the district court of Wyandotte County denying appellant's petition under K.S.A. 60-1507 to set aside his sentence. We reverse and remand to the district court for the purpose of granting appellant a new trial.

Appellant was convicted in 1974 of murder under the felony murder rule.

On direct appeal, the Supreme Court affirmed the conviction. *State v. Bey,* 217 Kan. 251, 535 P.2d 881. In our consideration of this matter, we have included review of the evidence as stated in that opinion and as disclosed in the record filed in that proceeding.

On September 11, 1973, three men robbed the Prolerized Steel Corporation in Kansas City, Kansas. In the course of the robbery two armed men entered the firm's offices, forced the employees to lie on the floor and took money from at least two of the employees. The third robber remained outside the building. During the robbery, Roy J. Lake was killed, apparently by the robber who was outside the building, as Lake attempted to flee.

Police efforts to apprehend the robbers were unsuccessful until John Lomax voluntarily surrendered and admitted his involvement. Lomax identified his accomplices as Wilbert Etier and Julian Bey, the appellant. Bey was arrested and, along with

Lomax, was charged with aggravated robbery and murder. Etier died sometime before he could be apprehended.

Appellant argues that his constitutional rights were violated by the knowing failure of the state to correct false testimony given by Lomax as to the existence of an agreement for leniency in exchange for Lomax's testimony against appellant. We agree.

Three separate proceedings in the district court of Wyandotte County are crucial to this appeal.

On January 7, 1974, Lomax appeared before Judge Claflin in division 1. Present at the proceedings, in addition to Lomax and Judge Claflin, were Lomax's attorney, Mr. Menghini, and assistant district attorney Holbrook. The initial statements to the court disclosed a plea bargained agreement had been concluded between Lomax and the state. The consideration for the agreement was to be Lomax's testimony at Bey's trial. The details of the agreement were revealed in the following exchange between the court, Menghini and Holbrook:

"THE COURT: He has been *told* then, that the murder charge will be dismissed?

"MR. MENGHINI: That's correct.

"THE COURT: And that he will be given the minimum sentence on the aggravated robbery?

"MR. MENGHINI: That's correct.

"THE COURT: And that he will not be in the same institution with Mr. Bey?

"MR. MENGHINI: Yes, we *told* him.

"THE COURT: And that he stands to gain by this?

"MR. MENGHINI: Well, he has one other charge that he is presently on parole on and it's attempted robbery—a charge he pleaded guilty to—and it's my understanding that the prosecutor has no objection to that sentence running concurrently with this sentence that your Honor will impose upon him.

"MR. HOLBROOK: That's correct, Your Honor." (Emphasis supplied.)

Lomax then pleaded guilty to the charge of aggravated robbery and the murder charge was continued.

A week later on January 14, 1974, Bey's trial began before Judge Miller in division 3. The state was once again represented by Holbrook, and appellant was represented by a Mr. Boal.

Holbrook, during voir dire and in his closing argument, informed the jury that he and Lomax's attorney had engaged in plea bargaining and the appearance of Lomax as a witness was part of the plea bargaining process. However, Holbrook did not divulge to the jury the specifics of the bargain nor that it had as a matter of fact been made. The specific statements of the assistant district attorney were as follows:

"Now, Mr. Lomax is [not] going to come in here and testify because he wants to. Mr. Lomax's attorney and I have engaged in what is called plea bargaining. Very frankly, in layman's terms, plea bargaining is negotiations. If any of you have been involved in civil litigation, you know negotiating is engaged in. Mr. Lomax will be here as a part of the plea bargaining process.

"Ladies and gentlemen, I want to know from each of you, and this is very important, is there any member of this panel who, just because Mr. Lomax has, through his attorney, engaged in some plea bargaining, who will just totally discount his testimony? What I am asking you is this. I want you to listen to his testimony in the framework of the facts and circumstances of this case and the statement that he gave. And I want you to give his testimony and his statement the weight and credibility that you think it deserves. But I don't want anybody to have any preconceived notions just because Mr. Lomax, through his attorney, has engaged in some plea bargaining.

"Is there anybody here who will not sit back and wait and listen to Mr. Lomax come in and testify and judge his testimony and give it the weight it deserves at that time when he testifies? Anybody here who will not do that? Is there anybody here who will be so prejudiced by the fact that Mr. Lomax is now a witness for the State that they just would not give his testimony any weight at all?

. . . . . . . . . . . . . . . .

"We had Mr. Lomax. I told you on voir dire Mr. Lomax is not coming just because he is a nice fellow and wants to come in and testify. He said there was plea bargaining. His attorney was in the courtroom. He was there to protect his rights."

Lomax testified against Bey and was questioned extensively by Boal as to the existence of a "deal" for his testimony. Lomax repeatedly denied any such "deal" existed. The following testimony is typical:

"Q. Now, have any promises been made to you by anyone concerning those felony murder charges if you come here and testify against Julian Bey today?
"A. No.
"Q. No promises at all, Mr. Lomax?
"A. No.

. . . . . . . . . . . . . . . .

"Q. You have not spoken to anybody about whether or not those charges will be dismissed if you testify?
"A. No.

. . . . . . . . . . . . . . . .

"Q. Have any deals been made with you?
"A. No.
"Q. No deals at all? No deals of any kind?
"A. No.
"MR. HOLBROOK: I object as repetitious.
"Q. You have not talked to your lawyer about a deal?
"A. No."

At the close of the state's evidence, during conference with the court in chambers, Boal endeavored to have the court ascertain the details of the plea bargaining negotiations between the state and Lomax, or his counsel. The court stated:

"What information I have indicates that the only consideration of any kind ever given to this defendant was that he was permitted to plead to the charge of aggravated robbery. He has not been promised probation or any other thing that I know of.

"I would ask the District Attorney to advise if there has been any such."

The assistant district attorney stated:

"Now, I told the jury in the voir dire a plea bargaining process, or through a plea bargaining process, that Mr. Lomax was going to come in here and testify. It is no secret that he entered a plea of guilty to the aggravated robbery charge.

"Now, to my knowledge, nobody has had any conversation personally with Mr. Lomax. I don't think there has been any perjured testimony.

"Plea bargaining has taken place, and I will tell you that on the record right now. You know that.

·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·

"He is saying that this man has made a deal, now, and he is denying it.

·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·

"I will tell the Court, to my knowledge, there have been no promises for probation, no promises for anything, anything along that line."

We find Lomax's testimony as to the non-existence of an agreement to have been patently false and the state did not correct it. The state failed, both in chambers and in the courtroom, to apprise the court and the jury of the fact and terms of the agreement.

On January 21, 1974, Lomax again appeared before Judge Claflin in division 1 for sentencing. Also appearing were Menghini and assistant district attorney Harris. The state consented to the defense motion for dismissal of the murder charge and Lomax was sentenced on the aggravated robbery charge in accord with the negotiated agreement. There was general agreement among the parties that the agreement included a dismissal of the murder charge in exchange for Lomax's testimony and that Lomax had performed his part of the agreement.

The constitutional issue here involved is raised for the first time in this action. The motion was heard and overruled by the same judge who had presided at Bey's trial. He held in substance that the testimony claimed to have been false could not in any reasonable likelihood have affected the judgment of the jury. He

further stated that it was his opinion that Bey received a fair trial and was patently guilty.

The failure of the prosecution to correct erroneous testimony by one of its witnesses as to the existence of offers or agreements for lenient treatment in exchange for testimony is a violation of the defendant's constitutional rights under the due process clause of the Fourteenth Amendment. In *Napue v. Illinois,* 360 U.S. 264, 3 L.Ed.2d 1217, 79 S.Ct. 1173 (1959), the United States Supreme Court overturned a murder conviction because a witness for the prosecution falsely testified he had received no promise of leniency in return for his testimony, and the prosecuting attorney, knowing the testimony was false, did nothing to correct it. The court said in part:

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, *People v. Savvides,* 1 N.Y.2d 554, 557, 136 N.E.2d 853, 854-855, 154 N.Y.S.2d 885, 887:

" 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " (pp. 269-270.)

The *Napue* decision was later fortified by *Giglio v. United States,* 405 U.S. 150, 31 L.Ed.2d 104, 92 S.Ct. 763 (1972). There a forgery conviction was overturned because an assistant United States attorney had promised the government's key witness he would not be prosecuted if he testified and the witness then falsely testified to the contrary. However, *Giglio* stated that a new trial is not always required where potentially helpful evidence is not revealed by the prosecution to a criminal defendant. The test was stated as follows:

". . . We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .' *United States v. Keogh,* 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under *Brady, supra,* at 87. A new trial is required if 'the false

testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .' *Napue, supra,* at 271." (p. 154.)

We believe the false testimony of Lomax could in reasonable likelihood have affected the judgment of the jury. We have reviewed the record and are convinced Lomax was a key witness for the state at appellant's trial. He testified extensively about preparations for the robbery, described the firearms and clothing of each of the robbers, described the perpetration of the robbery in some detail and recounted the incriminating conversations of the participants. Lomax testified that he and appellant entered the Prolerized Steel offices armed respectively with a chrome revolver and a shotgun. As the two entered the building, the deceased, Roy Lake, ran out of the building attempting to escape but was fatally wounded by Etier who had remained in the car. After making the four remaining individuals in the office lie on the floor, appellant and Lomax cleaned out the cash drawers and took money from the safe. Lomax described in detail the getaway and the statements of Etier as he discussed the shooting of Lake. The three left the Prolerized Steel offices and went to the Argentine section of Kansas City, Kansas, where they picked up Lomax's car and split the money.

The district court discounted the importance of Lomax's testimony because two other eyewitnesses to the robbery were able to identify appellant as one of the robbers. However, of the four men who were in the Prolerized Steel office and were forced by the robbers to lie on the floor, two were unable to identify appellant. One was unable to identify appellant in a first lineup but made an identification at a second lineup five days later. The suggestiveness of the second lineup was a matter of controversy at the appellant's trial and on the direct appeal. Only one of the four could identify appellant from the start. Under these circumstances, the conclusion that Lomax was an important witness in the state's case against appellant is inescapable. Therefore, Lomax's credibility also was of importance and the jury should have been presented with all relevant facts bearing upon his credibility.

The significance of the role played by Lomax is reflected in a letter sent by the district attorney's office to the state penal director following the sentencing of Lomax. Contrary to the state's present contention, it was said in that letter that, "were it

not for Mr. Lomax's cooperation and testimony, the solving of the above mentioned homicide and the conviction of Julian Bey probably would have been impossible."

The state's failure to correct the testimony of Lomax was not cured by general reference to plea bargaining during voir dire and closing argument. Such statements were inadequate to properly inform the jury of the agreement that had been made. In *Napue v. Illinois*, supra, the United States Supreme Court found vague references to plea bargaining were insufficient to apprise the jury of the agreement the prosecution had actually made with the witness.

The state's failure to correct Lomax's testimony was not cured by appellant's counsel's attacks upon Lomax's credibility. Statements by appellant's counsel were argument and not evidence, and the jury was so instructed. In *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976), the argument that defense counsel's "searing attack" upon the testimony of a witness cured a failure by the prosecution to disclose an agreement for lenient treatment was specifically rejected. The court said, "No matter how good defense counsel's argument may have been, it was apparent to the jury that it rested upon conjecture  .  .  ." (p. 451.)

Our Supreme Court has held that where error is of a constitutional character, it will not be ground for reversal if it is harmless beyond a reasonable doubt. *State v. Arney,* 218 Kan. 369, 544 P.2d 334. In applying the Kansas harmless error rule (K.S.A. 60-2105) to a federal constitutional error, the appellate court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and to declare such a belief beyond a reasonable doubt. *State v. Thompson,* 221 Kan. 176, 558 P.2d 93; *State v. Hamilton,* 222 Kan. 365, 564 P.2d 536. See also *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967); *Harrington v. California,* 395 U.S. 250, 23 L.Ed.2d 284, 89 S.Ct. 1726 (1969); *Milton v. Wainwright,* 407 U.S. 371, 33 L.Ed.2d 1, 92 S.Ct. 2174 (1972). We cannot declare that we believe beyond a reasonable doubt that the constitutional error had little, if any, likelihood of having changed the result of the trial in this case.

We do not lightly reverse the decision of the district court and are mindful of the additional expense and inconvenience a new trial will require of the state. Further, we fully respect the trial court's conclusions that the testimony of Lomax had little, if any,

likelihood of having changed the result of the trial and that Bey was patently guilty. However, it is our conclusion that there was error and we are unable to make the two requisite declarations necessary to a holding of harmless error. The contentions of the state in its brief and on oral argument have not proved to us beyond a reasonable doubt that the error complained of made little, if any, contribution to the verdict obtained. See *Chapman v. California,* supra.

In view of our holdings above, it is not necessary that we address the other point raised by appellant.

Reversed and remanded.