No. 48,231

STATE OF KANSAS, *Appellee, v.* EARL HALL, *Appellant.*

(556 P. 2d 413)

Opinion filed November 6, 1976.

*Jay H. Vader,* of Maurin, McCamish & Vader, of Kansas City, argued the cause, and *J. Paul Maurin III* and *M. Warren McCamish,* of the same firm, were with him on the brief for the appellant.

*Dennis L. Harris,* deputy district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Nick A. Tomasic,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Earl Hall appeals from a jury conviction of burglary (K. S. A. 21-3715) and felony theft (K. S. A. 21-3701). Seven points are raised and will be considered, but first a brief statement of facts.

The J. C. Penney store at 722 Minnesota Avenue in Kansas City, Kansas, was burglarized at midnight on May 7, 1975. Two glass doors were broken and four green leisure suits worth $120 were missing. A witness testified he was sitting on the front steps of the Y. M. C. A. building, which is about a half block from the intersection of 7th Street and Minnesota Avenue. While sitting there he saw an individual wearing brown pants, golf cap and a brown shirt with a flowery type design walking east on Minnesota Avenue just before midnight. A short time later he heard an alarm go off. About three minutes after hearing the alarm the witness saw the appellant, Earl Hall, come through the alley across the street from where the witness was sitting. The witness testified that appellant first looked up and down the street, then ran across the street and into the Y. M. C. A. building. The appellant, carrying several light green suits on hangers with J. C. Penney price tags hanging from them, passed within a few feet of this witness.

The witness, Joe Copeland, further testified he next saw appellant leaving the building without the suits and walking north on 8th Street. Copeland called the Kansas City Police Department and gave a physical description of the man as well as a description of his clothing. A police broadcast on the burglary was sent out which gave a description of the suspect and of the clothes he was wearing. A police officer heard the police broadcast and arrested the suspect three blocks north of the Y. M. C. A. building.

The suspect was transported to police headquarters, placed in a line-up and identified by the witness Copeland that same day.

The leisure suits were recovered from a room in the Y. M. C. A. building which had been rented by appellant's brother. Joe Copeland testified at the trial that he was personally acquainted with the brother, Rahn Hall, and Rahn was not the person who had carried the suits into the building. Rahn had been in a car wreck and had his face bandaged at the time this incident occurred, so

the witness could not have been mistaken in identifying the appellant.

Additional facts will be developed in discussing the points raised on appeal. The first point concerns the appearance of the appellant in jail clothing in full view of the jury panel. The jury panel had been sworn to answer questions on the *voir dire* examination. At that time appellant's trial attorney approached the bench and made the following request out of the hearing of the jury panel:

"I'd like to make two requests: I'd like to ask that this entire panel be dismissed for the reason that my client is supposed to be brought down here in civilian clothes, not his jail clothing. I'd like the record to reflect he's got a black silk, sleeveless, nylon T-shirt on, pair of blue slacks, come up just below his knees, and pair of long black socks and house slippers on."

The trial court denied the request for a mistrial but declared a recess and directed that the appellant be permitted to dress in civilian clothes. The appellant returned to the courtroom dressed in civilian clothes. The same jury panel was then recalled and the selection of the jury proceeded.

This raises a question of first impression in Kansas. The federal courts and several state courts have discussed the issue. The cases have been collected in an annotation which considers the propriety and prejudicial effect of compelling the accused to wear prison clothing at a jury trial. See 26 A. L. R. Fed. 535, anno.—Wearing Prison Garb at Jury Trial. Fair trial concepts, similar to those inherent in the U. S. Constitution, are incorporated in the Constitution of the State of Kansas, Bill of Rights, § 10. In addition to our constitutional provision there is a statutory declaration that a defendant in a criminal trial shall be presumed innocent until the contrary is proven. ( K. S. A. 21-3109. )

Most federal courts have held that to compel a prisoner to stand trial in prison clothing, which is clearly identifiable to a jury such as clothing with numbering or lettering appearing thereon, constitutes a denial of the prisoner's right to the presumption of innocence as guaranteed by the due process clause of the United States Constitution. (See *Hernandez v. Beto*, [5 CA 1971] 443 F. 2d 634, cert. den. 404 U. S. 897, 30 L. Ed. 2d 174, 92 S. Ct. 201; *Bentley v. Crist*, [9 CA 1972] 469 F. 2d 854; *Gaito v. Brierley*, [3 CA 1973] 485 F. 2d 86, 26 A. L. R. Fed. 529. )

There can be no question that a practice of requiring an accused to stand trial in distinctive prison clothing, such as that described in the present case, may result in an unfair trial and may deny the

prisoner the presumption of innocence mandated by the Kansas Bill of Rights, § 10 and K. S. A. 21-3109. This practice, if it exists in Kansas, should be discontinued.

However, if a prisoner voluntarily chooses to be tried in prison garb or fails to object at the trial, his voluntary action or lack of action may constitute an effective waiver of his right to appear at the trial in civilian clothing. (*Gaito v. Brierley*, supra; *Lemons v. United States*, [3 CA 1974] 489 F. 2d 344; *Estelle v. Williams*, 425 U. S. 501, 48 L. Ed. 2d 126, 96 S. Ct. 1691.)

There was no waiver or voluntary appearance by the appellant in this case. Appellant requested that he be permitted to put on his civilian clothes before being brought into the courtroom. In addition his attorney brought the matter to the attention of the trial judge. However, the appearance of an accused in prison garb at a trial or some portion thereof, does not in and of itself constitute reversible error. It must be shown that the accused was prejudiced by such appearance in that such appearance resulted in an unfair trial. (*Watt v. Page*, [10 CA 1972] 452 F. 2d 1174, cert. den. 405 U. S. 1070, 31 L. Ed. 2d 803, 92 S. Ct. 1520; *Anderson v. Watt*, [10 CA 1973] 475 F. 2d 881; *United States v. Williams*, [10 CA 1974] 498 F. 2d 547.)

In the present case the appellant's appearance in court dressed in prison garb was of limited duration. The trial judge promptly corrected the situation when it was first brought to his attention. The major portion of the trial occurred after appellant had changed into civilian clothing. The appellant was dressed in civilian clothing during the questioning on *voir dire* and during the entire remainder of the trial proceedings. There is nothing in the record before us to indicate that a single juror was aware of the distinct nature of the clothing worn by appellant during his first appearance. No prejudice has been shown and if we were to reverse this case it would have to be on a holding that an appearance in prison garb *per se* results in an unfair trial. This we refuse to do. The evidence of guilt was clear and convincing. We can say beyond a reasonable doubt that the brief appearance of appellant in prison garb did not have substantial effect upon the ultimate verdict. (See *State v. Fleury*, 203 Kan. 888, Syl. ¶ 2, 457 P. 2d 44.)

The second point concerns the limitation on evidence affecting the credibility of the state's principal witness, Joe Copeland. On cross-examination he testified he had been a security officer for an

organization and had resigned pending suspension. The suspension had arisen from some incident in which he had an accident while engaged in a high speed chase of a traffic violator. He further testified he was implicated in another incident involving the theft of stereo speakers. When the defense put on its evidence it called Copeland's supervisor at the time Copeland was discharged as a security officer. This supervisor testified that Copeland had been fired and that he had lied when he said he resigned pending a suspension. The trial court limited the testimony of this witness and would not let the defense go into the facts of the specific incident any further.

K. S. A. 60-420 provides:

"Subject to sections 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issues of credibility."

Contrary to the contention of the defense made during the trial, K. S. A. 60-422 does not authorized any particular type of evidence bearing on credibility, it imposes limitations on its admissibility. In our present case the credibility of Copeland was the focal point and the limitation on inquiry was as to specific facts of the incident. A trial judge must be given judicial discretion in determining the relevancy and extent of extrinsic evidence which is offered to test the credibility of a witness under K. S. A. 60-420. In the absence of court discretion to control the extent of credibility evidence the true issues in a criminal trial might well be obscured by trial of the witnesses.

In discussing the limitation imposed by K. S. A. 60-422 (*d*) this court in *State v. Humphrey*, 217 Kan. 352, 537 P. 2d 155, said:

"It has been stated that the reason for the restriction is that where character is only incidentally involved it would not be expedient to let the trial go off on collateral tangents which would result from trying out the factual issues involved in the proof of specific instances of conduct. . . ." (p. 364.)

On the issue of credibility of a witness the trial court's determination as to the proper extent and limitation on extrinsic evidence will not be reversed on review except for an abuse of judicial discretion which affirmatively appears to have affected the substantial rights of the party complaining. (K. S. A. 60-2105; *State v. Winston*, 214 Kan. 525, 520 P. 2d 1204.) We find no abuse of discretion.

As his third point appellant complains of the testimony of a

police officer concerning communications with the police dispatcher about the burglary, the description of the suspect and the whereabouts of the suspect when last seen by Copeland. Appellant argues that the contents of the police dispatch were inadmissible as hearsay. The matter has been repeatedly considered and disposed of in prior cases. When an officer testifies as to the details of a police dispatch overheard by him, merely to provide some explanation for his subsequent actions in locating the defendant, the details of the police dispatch are admissible in evidence. Testimony is not inadmissible as hearsay evidence when it is not offered to prove the truth of the matter asserted. It is hearsay but it is not inadmissible as such. (See State v. Trotter, 203 Kan. 31, 453 P. 2d 93; State v. Hollaway, 214 Kan. 636, 522 P. 2d 364; State v. Ritson, 215 Kan. 742, 529 P. 2d 90.)

The appellant's fourth point raises questions concerning the composition and fairness of the line-up. It was conducted the day of the burglary. Appellant was a black man and four black males from the county jail participated. There was a variance of from two to three inches in height and from 15 to 35 pounds in weight. The identifying witness, Copeland, made a positive identification of appellant. Copeland had seen the appellant at close range and on three different occasions immediately prior to and after the burglary. The identifying witness was directed to pick out the appropriate suspect. He was not advised that he was under no obligation to identify anyone.

Some factors to be considered in evaluating the likelihood of misidentification at a line-up are (1) the opportunity of the witness to view the accused at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the accused, (4) the level of certainty displayed by the witness at the confrontation, and (5) the length of time between the crime and confrontation. See State v. Bey, 217 Kan. 251, 535 P. 2d 881.

On consideration of the totality of the circumstances surrounding the line-up we find nothing unnecessarily suggestive or conducive to an irreparable mistaken identification. The motion to suppress evidence of the line-up identification was properly overruled after applying the guidelines set forth in State v. Bey, supra; State v. Deffenbaugh, 217 Kan. 469, 536 P. 2d 1030; State v. Carney, 216 Kan. 704, 533 P. 2d 1268; and State v. McCollum, 211 Kan. 631, 637, 507 P. 2d 196.

Appellant's fifth specification relates to the following instruction:

"In order to return a verdict, all jurors must agree upon the verdict. In pursuing such a goal, jury deliberation should be conducted in a businesslike manner. Upon submission of a case to it, the jury should first select a foreman. He should see to it that discussion goes forward in a sensible and orderly fashion and that each juror has the opportunity to discuss fully and fairly.

"The attitude and conduct of jurors at the outset of their deliberations are matters of considerable importance. It is rarely helpful for a juror, upon entering the jury room, to make an emphatic expression of his opinion on the case or to announce a determination stand for a certain verdict. The result of conduct of this nature might be that a juror because of personal pride would hesitate to recede from an announced position when shown that it is fallacious. It is natural that differences of opinion will arise. When they do, each juror should not only express his opinions but the reasons upon which he bases them. Although a juror should not hesitate to change his vote when his reason and judgment [are changed, each juror should vote according to his honest judgment], applying the law from the instructions to the facts as proved. If every juror is fair and reasonable a jury can almost always agree. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment."

The instruction was given along with the other instructions. Appellant argued on his motion for new trial that the instruction was too lengthy and confusing. A similar argument is made on appeal. The instruction in question was taken from PIK Civil 1.07. We see nothing coercive or confusing about it for it appears to be a fair statement concerning the necessary procedure to be followed by the jury and the proper attitude which the jurors should maintain in the jury room.

The sixth specification of error accuses the trial judge of lecturing the jury and of improperly having the oath of jurors reread to them. The jury had deliberated for three hours. They were called into the courtroom before being allowed to go home at the end of their first day of deliberations. The judge gave them the usual admonition against discussing the case with anyone outside the jury room. He further directed the jurors to report back the following morning at nine o'clock and asked the court reporter to reiterate the oath which the jurors had previously taken. The oath was recited and the judge then said:

"THE COURT: Now, that is the oath that you took. If you will read the Instructions, it will tell you what to do. Now, tomorrow morning, when you come back and go back up there to deliberate, I want you to read the Instructions, and proceed. Everyone must participate."

As an explanation of the judge's final comment on participating, it should be mentioned that a note had previously been sent by the foreman of the jury advising the judge that one member of the jury would not vote.

Although a trial judge cannot be permitted to intimidate and coerce a jury, it is impossible for this court to say this jury was intimidated or coerced by this particular discourse. The judge's remarks do not approach the level of the "Allen type instruction" cautioned against in such cases as *State v. Troy,* 215 Kan. 369, 524 P. 2d 1121; *State v. Boyd,* 206 Kan. 597, 481 P. 2d 1015, cert. den. 405 U. S. 927, 30 L. Ed. 2d 800, 92 S. Ct. 977; *Bush v. State,* 203 Kan. 494, 454 P. 2d 429; and *State v. Earsery,* 199 Kan. 208, 428 P. 2d 794. The danger in giving an intimidating or coercive instruction arises when a jury has reported its failure to agree on a verdict. Under such circumstances a coercive instruction might induce a jury to return a verdict which they would not otherwise have reached. The jury in this case had been instructed to report a failure to agree, if such should happen, by having the foreman send the judge a written note to that effect. No such failure to agree was reported.

As to appellant's final point, we have examined the notes sent to the judge by the jury foreman. It is not contended that these notes were improperly handled or answered. The argument made is that the notes show the jury was confused on certain matters and that a mistrial should have been declared. The argument is without merit.

The judgment on these convictions is affirmed.