IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,992

STATE OF KANSAS,
*Appellee*,

v.

JOHN PEPPER,
*Appellant*.

SYLLABUS BY THE COURT

1.

The crime of aggravated criminal sodomy pursuant to K.S.A. 2022 Supp. 21-5504(b)(3)(A) requires the State to prove beyond a reasonable doubt that (1) sodomy occurred; (2) the victim did not consent; and (3) the victim was overcome by force or fear.

2.

"Overcome by force or fear" has the same meaning in our aggravated criminal sodomy statute as it has in our rape statute.

3.

Following a district court's ruling that evidence will not be admitted, the plain language of K.S.A. 60-405 provides that a district court may approve of various forms and methods of proffering a record for purposes of appellate review of that district court ruling.

4.

If the district court does not approve an alternative form of proffer, the proponent of excluded evidence must indicate the substance of the expected evidence by questions indicating the desired answers.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Oral argument held May 15, 2023. Opinion filed December 8, 2023. Affirmed.

*Laura Stratton,* of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson* and *Debra J. Wilson*, of the same office, were on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: A jury convicted John Pepper of felony murder with the predicate felony of aggravated criminal sodomy. On direct appeal, he asserts three district court errors: (1) evidence insufficiency, (2) erroneous exclusion of expert opinion, and (3) permission for one camera in the courtroom during trial and pretrial proceedings. On direct appeal, we affirm.

FACTS AND PROCEDURAL BACKGROUND

When Wichita Police Detective Dustin Noll arrived at the Wichita residence where he had been dispatched, he heard screams coming from inside where C.C. had just discovered her 72-year-old mother, R.G., lying dead on the kitchen floor and nude from the waist down. As Noll attempted lifesaving measures on R.G., backup law enforcement

2

discovered Pepper in a nearby bedroom closet, sitting on the floor hugging his dog. The officers arrested him. Law enforcement also found a small knife in Pepper's pocket.

At trial, the State called numerous witnesses. Witnesses at the scene had noticed a lot of blood in R.G.'s mouth and heard bones cracking when starting CPR. Shortly after Pepper's arrest, forensic nursing coordinator Amy Mitchell collected numerous DNA samples from Pepper's mouth, penis, anus, and the area between his left index and pointer fingers.

Tina Peck, a sexual assault examination nurse who conducted a postmortem examination of R.G., took DNA samples from R.G.'s mouth, anus, and vagina. She noted bruising on R.G.'s genitals, which could have been caused by blunt force trauma from a finger or an erect penis. She testified the injuries could have resulted from either consensual or nonconsensual sex.

Dr. Jamie Oeberst, a coroner, conducted an autopsy. She noted bruising and scrapes around R.G.'s mouth on her left cheek, bruising and scrapes on the inside of R.G.'s lower lip, bruising on the inside of R.G.'s upper lip, bruising and a "superficial laceration" inside R.G.'s left cheek, scrapes near her left eye and left cheek, bruising on her tongue, multiple scalp bruises, and scrapes on the eyelids. There were also bruises and scrapes on R.G.'s arms, legs, chest, and back. Dr. Oeberst explained bruises require blood pressure and that chest compressions circulate blood, but only the bruises on the left side of R.G.'s chest could have been caused by chest compressions. Further, R.G.'s lumbar vertebra in her lower back had been fractured. The muscle surrounding the fracture had been torn, meaning "she had a significant injury in this area of her back." The injury could have been caused by twisting or a sharp flexion like bending forward, but Dr. Oeberst concluded the cause of the injury was unknown.

Dr. Oeberst also testified that R.G. had petechial hemorrhages, which are small hemorrhages in the eyes and face that can be caused by many things including smothering. But petechial hemorrhages may also be caused by the resuscitation efforts and therefore she could not definitively identify their cause. R.G.'s toxicology screen was negative for drugs and alcohol.

Based on these injuries, Dr. Oeberst testified that R.G.'s cause of death was a cardiac event caused by blunt force trauma. R.G. had a history of health issues including high blood pressure, an enlarged heart, atrial fibrillation, congestive heart failure, shortness of breath, lung disease, sarcoidosis, scarred lungs, and a prior pulmonary embolism. The blunt force trauma caused stress and pain that compromised these preexisting conditions. Dr. Oeberst testified that "but for the blunt force injuries, she wouldn't have died that day." She also noted that a potential, but not conclusive, cause of death was smothering based on R.G.'s mouth injuries and the petechial hemorrhages. These injuries suggested a hand could have been placed over R.G.'s mouth. R.G. had been intubated at the scene, and the intubation may have caused mouth injuries, but Dr. Oeberst had never seen an intubation cause injury on the insides of cheeks. R.G. also had several broken ribs, which Dr. Oeberst attributed to chest compressions.

Steve Hoofer, a DNA analyst, testified that Pepper could not be excluded from the DNA found in R.G.'s anus, though DNA results could not provide information on how the DNA sample was deposited. The substance on Pepper's left index finger was presumptively blood, and R.G. could not be excluded as a major contributor to the blood's DNA profile.

The neighbor who called 911 had known R.G. for nearly 20 years. During this time, she never saw R.G. with a boyfriend or male interest. She testified that R.G. had numerous health issues, used an inhaler, and did not drive. This neighbor also explained

4

that she had seen Pepper a few times before, and that he began hanging around R.G.'s house for nearly a week before R.G.'s death.

R.G.'s best friend and landlord had known R.G. for 19 years. This close friend knew about R.G.'s health problems, noted that R.G. used a walking cane, and explained that she took R.G. out for errands. She never met Pepper and was under the impression that R.G. was celibate.

C.C. testified that she met Pepper, who she knew as "HD," around a month and a half before R.G.'s death. C.C. had befriended Pepper shortly after he moved to Wichita from Colorado. When Pepper became homeless after being evicted from his residence, C.C. invited Pepper to stay at the home she shared with R.G. Initially, R.G. said the arrangement was fine. Pepper began sleeping inside, but at some point, R.G. told C.C. she wanted Pepper to leave. After that, Pepper slept in their yard with his belongings. R.G. stopped letting Pepper in and forced him to stay outside even during the hottest parts of the day.

C.C. explained that Pepper and R.G. never napped together, but she was then shown a transcript of her conversation with a detective in which she explained they napped together several times. C.C. explained that Pepper was not supposed to be inside the house without her. That said, Pepper never did anything to make her worry about him harming R.G. In fact, R.G. told C.C. to not throw Pepper's property away, and R.G. would feed him and let him take showers and naps. C.C. never saw her mother in any romantic relationships and believed R.G. had been celibate for around 20 years.

C.C. then recounted the day her mother died. C.C. had left the home around 3 p.m. When she left, R.G. was sitting on the loveseat because her upper respiratory issues made it difficult to breathe when lying down. C.C. returned around 6 p.m. She tried to get in the

front door, but it was locked so she went to the back door. The back door was usually "locked" by placing a knife between the door and jamb. When C.C. got to the back door on that day, the knife was on the porch. She moved to open the door and noticed R.G. was on the kitchen floor, lying face up. She blew into R.G.'s mouth and blood came out of R.G.'s nose. C.C. did not manipulate R.G.'s body beyond providing mouth to mouth. At this point she ran across the road, alerted a neighbor to call for help, and ran back to her mother.

At the time, C.C. had been up for two days on a crack cocaine binge. She was drunk and high. She admitted to a drug and alcohol addiction. She was also schizophrenic and bipolar and had bad memory lapses.

Following the State's evidence, the defense made a motion for a directed verdict, which was denied. Pepper then presented three witnesses.

Jennifer Johnson, who has a doctorate in nursing practice and conducts forensic medical examinations, had reviewed the sexual assault examinations of Pepper and R.G., as well as the autopsy report and photographs. Johnson testified that R.G.'s genital bruising could have been caused by consensual sex or even "simple genital wiping."

As for the autopsy, Johnson testified that the injuries on R.G.'s face could be consistent with lifesaving measures including mouth to mouth resuscitation, placing an endotracheal tube, and the velcro strap and device placed around the patient's head to hold the endotracheal tube in place. Johnson also noted that the petechiae could have been caused by a cardiac event. Johnson agreed that the injuries were potentially smothering injuries. In sum, Johnson suggested the injuries could have been caused by lifesaving measures, smothering, or the cardiac event that killed R.G.

Dr. Randy Lance Parker, a licensed psychologist, had conducted an evaluation of Pepper that included two interviews, various psychological tests, interviews with Pepper's family, and a review of many documents. Dr. Parker found Pepper was a high functioning autistic. He also opined that Pepper's crack cocaine use would have diminished Pepper's impulse control.

Dr. Parker found Pepper had a medium IQ and had trouble in both school and the military. Pepper also suffered from alcohol abuse disorder, cannabis abuse disorder, and cocaine abuse disorder. His military service did not succeed because he could not stop using alcohol and marijuana. Dr. Parker explained it was impossible to understand Pepper without acknowledging his life-long alcohol and marijuana abuse, and that he began using crack cocaine in the time just before R.G.'s death.

Finally, Pepper testified in his defense. The description of his relationship with R.G. differed from C.C.'s. Pepper testified that, during the time he had his own residence, he would visit R.G. when C.C. was not present. He explained that R.G. would let him in, and they would eat and watch game shows on a television in R.G.'s bedroom. He sat in a chair the first time they watched television, but as the visits continued, he began sharing the bed with R.G. He did not spend the night during this time.

According to Pepper's account, he and R.G. developed a relationship that began as motherly but, over time, became sexual. He testified they had consensual penile/vaginal sex two times while he still had a separate residence. He also explained that he would call R.G. "pumpkin" and expressed regret that he never bought her flowers. He said C.C. was not aware these visits were occurring.

Pepper explained that C.C. invited him to stay at R.G.'s house after he was evicted. He brought some of his property and dropped it off in R.G.'s yard. Pepper testified that he only stayed at the residence for two days. He slept outside both days.

Pepper then gave his account of R.G.'s death. That morning, he noticed the back door was ajar and started talking with R.G. R.G. allowed him to put his dog in the closet, and then Pepper met R.G. in the kitchen. R.G. told him she was constipated. Pepper suggested having anal sex to help with her constipation. R.G. thought about it and then agreed. Pepper then removed R.G.'s undergarments, and they had sex in the kitchen, rather than the bedroom, because Pepper knew C.C. was returning home soon and he wanted to complete the act in a hurry to avoid being caught. After Pepper had an orgasm, R.G. "just fell right on her face, kind of like—right like that, on her jaw, her face . . . ." Pepper then put his finger in her mouth to try to remove her teeth. He also unsuccessfully tried to roll her over. He did not notice any blood at the time. He thought R.G. was dead, so he went to sit in the closet with his dog. He explained that he was in shock, and he waited in the closet until the police found him. He had no explanation for the bruising covering R.G.'s body.

Pepper admitted to at first telling police that someone put him in the closet, even though at trial he conceded that was incorrect. Pepper also contested some of the neighbors' testimony about his interactions with them. Finally, Pepper testified that his morals deteriorated after he began using crack cocaine, but he insisted he never forced anything on R.G.

The jury found Pepper guilty of one count of first-degree felony murder and one count of aggravated criminal sodomy. Pepper filed a motion for judgment of acquittal and a motion for new trial, which were both denied. The court sentenced Pepper to life in prison with no possibility of parole for 25 years for the first-degree murder conviction,

and 195 months in prison for the aggravated criminal sodomy conviction. The court ordered the sentences to run consecutive.

Pepper directly appeals. Jurisdiction is proper. K.S.A. 2022 Supp. 22-3601(b)(3) (Supreme Court has jurisdiction over life imprisonment cases); K.S.A. 2022 Supp. 22-3601(b)(4) (Supreme Court has jurisdiction over off-grid crimes); K.S.A. 2022 Supp. 21-5402(b) (felony murder is an off-grid crime).

DISCUSSION

*There was sufficient evidence for a rational fact-finder to conclude that Pepper committed aggravated criminal sodomy.*

Pepper first challenges his aggravated criminal sodomy conviction, arguing that the State did not present sufficient evidence to show that he committed a forcible act. The State responds that Pepper asks this court to reweigh the evidence. This issue is properly preserved for review. *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008) (criminal defendant need not challenge sufficiency of the evidence before the trial court to preserve it for appeal).

*Standard of Review*

> "The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires proof beyond a reasonable doubt of every element of the crime charged. It also requires fact-finders to rationally apply the proof-beyond-a-reasonable-doubt standard to the facts in evidence. So when a criminal defendant challenges the evidence's sufficiency, a reviewing court must examine the evidence in the light most favorable to the prosecution and decide whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' 'All that a

9

defendant is entitled to on a sufficiency challenge is for the court to make a "legal" determination whether the evidence was strong enough to reach a jury at all.' [Citations omitted.]" *State v. Sieg*, 315 Kan. 526, 530-31, 509 P.3d 535 (2022).

Generally, we will not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022). Instead, "[a] reviewing court need only look to the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained." 316 Kan. at 350. Additionally, our review is unlimited insofar as this issue requires statutory interpretation. *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014).

> "'The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. In ascertaining this intent, we begin with the plain language of the statute, giving common words their ordinary meaning. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. But if a statute's language is ambiguous, we will consult our canons of construction to resolve the ambiguity. [Citations omitted.]'" *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023).

*Analysis*

Pepper was convicted of aggravated criminal sodomy. K.S.A. 2022 Supp. 21-5501 defines sodomy as "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object; or oral or anal copulation or sexual intercourse between a person and an animal."

The amended charging document alleged Pepper "unlawfully engage[d] in sodomy with [R.G.] or cause[d] [R.G.] to engage in sodomy with any person or animal, without

[R.G.]'s consent under circumstances when [R.G.] was overcome by force or fear." Thus, Pepper was convicted under K.S.A. 2019 Supp. 21-5504(b)(3)(A):

"(b) Aggravated criminal sodomy is:

. . . .

(3) sodomy with a victim who does not consent to the sodomy or causing a victim, without the victim's consent, to engage in sodomy with any person or an animal under any of the following circumstances:

(A) When the victim is overcome by force or fear."

This version of aggravated criminal sodomy requires the State to prove beyond a reasonable doubt that (1) sodomy occurred; (2) the victim did not consent; and (3) the victim was overcome by force or fear. *State v. Ninh*, 63 Kan. App. 2d 91, 100, 525 P.3d 767 (2023). Here, no one contests that sodomy occurred. Pepper contends the issue on appeal is whether R.G. consented to anal sex "or whether it was violently forced upon her." The State agrees.

We have not evaluated the "overcome by force or fear" language in our aggravated criminal sodomy statute, but we have outlined the meaning of the identical phrase in our rape statute. Compare K.S.A. 2022 Supp. 21-5503(a)(1)(A) ("[w]hen the victim is overcome by force or fear"), with K.S.A. 2022 Supp. 21-5504(b)(3)(A) ("[w]hen the victim is overcome by force or fear"); see, e.g., *State v. Brooks*, 298 Kan. 672, 692, 317 P.3d 54 (2014) (explaining "a rational factfinder could clearly conclude that J.P. did not consent to the sexual intercourse because she was overcome by fear, i.e., her fear got the better of her; her fear affected or influenced her so strongly as to make her physically helpless; her fear overpowered, conquered, and subdued her"); *State v. Borthwick*, 255

11

Kan. 899, 913-14, 880 P.2d 1261 (1994) (discussing the "force or fear" language in Kansas' rape statute).

We interpret the language the same in both the aggravated criminal sodomy and the rape statutes because of the identical statutory language and the similarity of the proscribed conduct. See *Northcross v. Bd. of Educ. of Memphis City Schools*, 412 U.S. 427, 428, 93 S. Ct. 2201, 37 L. Ed. 2d 48 (1973) ("The similarity of language in § 718 and § 204[b] is, of course, a strong indication that the two statutes should be interpreted pari passu."); *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 580, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015) (Alito, J., dissenting) (noting "identical language in two statutes having similar purposes should generally be presumed to have the same meaning"); *State ex rel. Brant v. Bank of America*, 272 Kan. 182, 188, 31 P.3d 952 (2001) ("Ordinarily . . . identical words or terms used in different statutes on a specific subject are interpreted to have the same meaning absent anything in the context to suggest that a different meaning was intended.").

Given the identical meaning of "overcome by force or fear," our cases interpreting the rape statute inform our understanding of the statutory requirements of the relevant subsection of the aggravated criminal sodomy statute. In *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000), we "declined to define in absolute terms the degree of force required to sustain a rape conviction." Force "is a highly subjective concept that does not lend itself to definition as a matter of law." *State v. Tully*, 293 Kan. 176, 198, 262 P.3d 314 (2011) (citing *Chaney*, 269 Kan. at 20). We must "consider the record as a whole" and decide each case "on its [own] unique facts." *Borthwick*, 255 Kan. at 911. We have provided the following guidance:

12

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. [The Kansas rape statute] does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse." *Borthwick*, 255 Kan. at 914.

Pepper first argues the State relies entirely on circumstantial evidence to prove lack of consent and force. But even the gravest crime can be proved with circumstantial evidence and the logical inferences properly drawn from that evidence. *Zeiner*, 316 Kan. at 350; *State v. Chandler*, 307 Kan. 657, 669-70, 414 P.3d 713 (2018).

Next, Pepper's brief provides many ways that the evidence presented at trial could be understood to show his innocence. His argument is that the medical interventions, such as chest compressions and the endotracheal tube, caused the injuries to R.G.'s body, rather than a forcible act of sodomy.

The State agrees Pepper's brief is replete with ways R.G.'s injuries *could* have occurred, but asserts it is not our role to make that determination. The State is right. Pepper's argument asks us to reweigh the evidence, which we will not do. *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172 (2019) ("reviewing court generally will 'not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations'"). Instead, jurors are best equipped to evaluate the evidence presented at trial. See *State v. Franklin*, 206 Kan. 527, 528, 479 P.2d 848 (1971) (jury's function to evaluate evidence within framework of all evidence adduced). "[T]he jury discerns the truth through the process of trial, particularly the taking of the oath or affirmation, the jury's observation of the witness' demeanor, and the refining fires of cross-examination." DeCoux, *Textual*

13

*Limits on the Residual Exception to the Hearsay Rule: The "Near Miss" Debate and Beyond*, 35 S.U. L. Rev. 99, 100 (2007).

Rather than resolving evidentiary conflicts or evaluating the credibility of Pepper, C.C., or the other witnesses, our role is to "look to the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained." *Zeiner*, 316 Kan. at 350. In doing so, we must view all evidence in the light most favorable to the State and determine whether a rational fact-finder could have found Pepper guilty of aggravated criminal sodomy beyond a reasonable doubt. We conclude a rational fact-finder could have done so here.

As noted above, the State need not prove "beating or physical restraint" and must instead prove "that [R.G.] did not give her consent and that [R.G.] *was overcome* by force or fear to facilitate the sexual intercourse." *Borthwick*, 255 Kan. at 914. We find that, based on the following nonexhaustive list of evidence, a reasonable juror could have found R.G. did not consent and was overcome by force or fear:

- Detective Dustin Noll's testimony that R.G. was naked from the waist down when he arrived on scene.
- C.C.'s testimony that blood came out of R.G.'s airway just after C.C. attempted mouth to mouth.
- EMS testimony that R.G. had a significant amount of blood in her airway when resuscitative efforts began.
- Peck's testimony that R.G. had genital bruising that could be caused by nonconsensual sex.
- Dr. Oeberst's testimony about the bruises and scrapes covering R.G.'s body.
- Dr. Oeberst's testimony that only some bruises could have been caused by chest compressions.

- Dr. Oeberst's testimony that R.G.'s vertebra fracture could have been caused by a sharp forward movement.

- Dr. Oeberst's testimony that R.G. had petechial hemorrhages which could suggest smothering.

- Dr. Oeberst's testimony that she had never seen an endotracheal tube cause some injuries in R.G.'s mouth, particularly the injuries to the insides of R.G.'s cheeks.

- Dr. Oeberst's conclusion that blunt force trauma caused R.G.'s cardiac event.

- The landlord's testimony that R.G. was her best friend and revealed nothing about Pepper.

- The landlord's testimony that she believed R.G. was celibate.

- C.C.'s testimony that she believed R.G. was celibate.

- C.C.'s testimony that R.G. wanted Pepper to leave.

- C.C.'s testimony that she did not believe R.G. and Pepper had ever been intimate.

- Johnson's testimony that some of R.G.'s injuries could have been caused by smothering.

- Pepper's testimony that he at first told police that someone else had put him in the closet.

Though the evidence allows for alternative inferences, "[s]ufficient circumstantial evidence does not need to exclude every other reasonable conclusion to support a conviction." *Zeiner*, 316 Kan. at 350.

When viewing the evidence in a light most favorable to the State, we conclude a rational fact-finder could have found Pepper guilty of aggravated criminal sodomy beyond a reasonable doubt.

15

*Pepper did not sufficiently proffer Dr. Parker's testimony about sexual deviance.*

Pepper next argues the district court erroneously excluded Dr. Parker's testimony that Pepper did not suffer from a sexual deviancy. The State responds in three ways. First, the evidence was insufficiently proffered and therefore the issue is not properly preserved for appellate review. Second, if the proffer is sufficient for appellate review, the district court appropriately excluded the evidence. Finally, any error was harmless. We agree Pepper made an inadequate proffer.

*Preservation*

When a party objects to an opposing party's presentation of evidence, the court must rule on that objection. If the objection is sustained, the proposed evidence is excluded from jury consideration. "When a district court excludes evidence at trial, the party seeking to admit that evidence must make a sufficient substantive proffer to preserve the issue for appeal." *State v. White*, 316 Kan. 208, 212, 514 P.3d 368 (2022). This rule "has dual purposes:  (1) It assures the trial court is advised of the evidence at issue and the parties' arguments, and (2) it assures an adequate record for appellate review." *State v. Gonzalez*, 311 Kan. 281, 299, 460 P.3d 348 (2020); see also 3 Kan. Law & Prac., Guide Kan. Evid. § 1:12 (5th ed.) ("As indicated, the proffer is a requirement to preserve appellate review. In addition, it gives the judge an opportunity to reconsider and change the ruling after a more complete disclosure of the proffered evidence.").

"A formal proffer is not required, and we may review the claim as long as 'an adequate record is made in a manner that discloses the evidence sought to be introduced.'" *White*, 316 Kan. at 212 (quoting *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 (2015). Though a proffer need not be formal, there are still rules about what may be

considered as being part of the proffer. We first turn to the relevant statute. K.S.A. 2022 Supp. 60-405 provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence *unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers.*" (Emphasis added.)

In *Gonzalez*, defense counsel told the court at a bench conference that they would ask the accomplice what they saw Gonzalez do on the night in question. We held the proffer insufficient because it was "not clear from this what Gonzalez anticipated [the accomplice] saying." *Gonzalez*, 311 Kan. at 300.

Similarly, in *State v. Hudgins*, 301 Kan. 629, 650-51, 346 P.3d 1062 (2015), we found a proffer of evidence about a police department policy was insufficient. During a sidebar, defense counsel only stated, "Yes, naturally, I would proffer that the Court accept the policy in the record for review for purposes of appeal." 301 Kan. at 650. The policy was not admitted as evidence at trial, and the policy was not included in the record on appeal. Based on this dearth of information, we concluded we could not review the district court's finding that the policy was not relevant. 301 Kan. at 651.

In *State v. Swint*, the defense wanted to present witness testimony that the victim asked the witness to file false claims against the defendant. The State filed a motion to exclude the evidence, the defendant filed a responsive pleading addressing the topic, and the district court held a hearing on the motion. We found this proffer was sufficient. *Swint*, 302 Kan. at 334.

17

In *State v. Evans*, 275 Kan. 95, 99-101, 62 P.3d 220 (2003), a murder defendant proffered that potential witness testimony would show that someone else committed the crime. While arguing a motion in limine, defense counsel explained the witnesses would testify that the alternative suspect had a gun, the gun was in the alternative suspect's hand following the shooting, and the witnesses never saw the defendant with a gun. We found this proffer was sufficient to allow review. 275 Kan. at 101.

As these cases show, the proffer presented to the court need not always be presented contemporaneously to the objection. See also *Marshall v. Mayflower Transit, Inc*., 249 Kan. 620, 622-23, 822 P.2d 591 (1991) (finding a proffer of expert testimony was sufficient because the court read the deposition prior to trial, the testimony was included in a pretrial motion, the court heard arguments on the matter, and the court allowed a written proffer to be filed posttrial). The plain language of the statute allows the court to agree to various forms of the proffer. See *Swint,* 302 Kan. at 332 ("Answers to discovery, the parties' arguments, or in-court dialogue may satisfy K.S.A. 60-405 depending on the circumstances.").

Here, Pepper claims that he presented his proffer in three parts, though this assertion is made for the first time on appeal. Thus, our first task is to ascertain from the record exactly what the proffer was. Next, we will explore the adequacy, or reviewability, of that proffer.

Pepper claims his proffer concerning Dr. Parker's sexual deviancy evidence collectively consisted of the following: (1) a written pretrial motion filed by the State to limit evidence, (2) defense counsel's informal oral colloquy at trial made immediately after, and in response to, the State's oral objection to the sexual deviancy evidence, and (3) Pepper's written posttrial motion for departure sentence.

18

Pretrial, the State filed a motion to exclude Dr. Parker's testimony. Notably, the motion's focus was Pepper's *autism*, not the lack of sexual deviancy. The motion did, however, briefly reference Dr. Parker's lack-of-sexual-deviancy findings by quoting a portion of Dr. Parker's report, though the report is not included in the record on appeal. The relevant quotation from the motion, about the report, reads:  "Further, psychological testing did not find that [Pepper] harbored any sexual deviancies. Testing suggested that [Pepper] holds traditional views of sex, is a follower in a relationships [*sic*] and is less likely to act on sexual thoughts than others." Pepper's response to the motion does not reference the sexual deviancy testimony.

During trial, but before Dr. Parker testified, the State made the following objection:

> "We had talked last week, I believe, maybe earlier this week about Dr. Parker's testimony and my objection to eliciting any testimony concerning tests he may have conducted on Mr. Pepper that would indicate he does not suffer from a sexual deviancy of any kind or speak to his sexual proclivities. I'm going to object to the relevance of that."

Pepper's counsel responded:

> "Yes, Your Honor, I understand the State's position. The only thing I would add on our side of the situation is I think it is relevant. We aren't talking about any type of specific behavior or if Mr. Pepper has more proclivity to try to rape somebody or not try to rape somebody.

> "The basic fact is is [*sic*] that Dr. Parker found that Mr. Pepper does not suffer from any type of sexual deviancy, even though he's charged with aggravated criminal sodomy. And it isn't overwhelming, there's no allegations, it's not particularly at issue

19

whether, you know, those—you know, those particular points. The particular point is we have a sexual act. And that's our position, Your Honor."

Posttrial, Pepper filed a motion for a durational departure sentence. The motion explains that Dr. Parker used the Garos Sexual Behavior Inventory (GSBI) to evaluate Pepper. Based on Pepper's scores, Dr. Parker concluded:

- "He was not likely to engage in extreme or aberrant sexual behavior,"
- "Defendant's sexual interest did not interfere with his normal functioning,"
- "His view on sexuality was conventional,"
- "He was able to be sexually stimulated without engaging in high risk or unrestrained sexual activity," and
- "Defendant did not display any sexual deviancies."

The posttrial motion also stated: "The GSBI scores are at odds with the behavior that led to Defendant's convictions. Defendant's lack of a history of any type of violence further demonstrates Defendant's actions were aberrant and in stark contrast with his behavior during the previous fifty years of his life."

The district court did not state explicitly which part, or parts, of the record it considered as the proffer, but the court ruled on the objection to the evidence after the second part was presented. The court sustained "any objection to [Dr. Parker] testifying about suffering from a sexual deviancy or likelihood of reoffending, the degree to which [Pepper] may suffer from some sort of sexual disorder or deviancy, ability to be able to rehabilitate or amenability to treatment." The court had two bases for doing so: (1) the testimony would invade the province of the jury, and (2) the probative value was questionable and outweighed by potential prejudice. The court did not reference either pretrial matters or potential posttrial matters in its ruling.

20

The plain language of K.S.A. 60-405 provides that a district court *may* approve of various forms and methods of proffering evidence. See *National Bank of Andover v. Kansas Bankers Sur. Co.*, 290 Kan. 247, 278, 225 P.3d 707 (2010) ("As noted, the court and counsel agreed that KBS could submit its proffer posttrial."). However, if the district court does not approve any particular form or method of proffering evidence, then the same statute demands that the "substance of the expected evidence" must be indicated "by questions indicating the desired answers."

Here, there is no indication in the record the district court *explicitly* approved an alternative to a substance-by-questions proffer. When the State objected to the sexual deviancy portion of Dr. Parker's report, Pepper did not ask the court to consider as his proffer pretrial motions and arguments, informal statements of counsel, posttrial motions or arguments, or even Dr. Parker's report.

But the record indicates the district court *implicitly* approved the form and method of counsel's informal colloquy during trial. We infer the court agreed to accept defense counsel's informal colloquy during trial for three reasons. First, the State's oral objection to admission of evidence was directly related to the specific subject of Dr. Parker's opinion that Pepper lacked sexual deviancy. Second, defense counsel's oral colloquy was made immediately after the State's objection and was also confined to the specific subject of Dr. Parker's opinion about Pepper's lack of sexual deviancy. Finally, the court's ruling came immediately after both parties' positions had been made concerning the specific matter of sexual deviancy and before Dr. Parker was scheduled to testify. The timing of the ruling implicitly indicates the district court believed it had received and considered the entirety of the information from which it was to render its ruling on the specific subject of Dr. Parker's sexual deviancy evidence.

21

Conversely, we cannot reasonably infer the district court implicitly approved Pepper's other asserted forms of proffer. The focus of the pretrial motion and hearing was Pepper's autism, not a lack of sexual deviancy. The posttrial motion's focus was Pepper's sentence, not trial evidence. Because the court did not explicitly or implicitly agree to consider these pretrial or posttrial motions and hearings for purposes of a *proffer*, Pepper's proffer was limited to defense counsel's colloquy during the trial.

After reviewing the content of defense counsel's oral colloquy, we hold it is insufficient for us to review the propriety of the district court's ruling to disallow the evidence. Though we have more information than in *Gonzalez* because we know Dr. Parker's conclusion, neither we nor the district court were provided with information explaining how Dr. Parker defined sexual deviancy, or the reason or purpose for admitting such evidence—in other words, how Pepper intended to use such evidence to bolster his defense in a manner consistent with the rules of evidence. Without that, the defendant fails to show the relevance of this evidence. In other words, even if we assume Pepper lacks sexual deviancy, we cannot judge from the proffer at trial why that matters. Cf. *Gonzalez*, 311 Kan. at 300 ("But even if the proffer established [the accomplice] would say he saw Gonzalez smoke marijuana or take a Xanax, there is nothing else about any other potentially relevant details his testimony could provide such as how much, when, or what specifically he observed about Gonzalez' behavior near the time of the crime."); *State v. Mays*, 254 Kan. 479, 486, 866 P.2d 1037 (1994) (proffer approved because it contained *both* the nature of the excluded evidence and its significance to the case). Nor can we review the district court's weighing of the proffered testimony's probativeness compared to its potential for unfair prejudice or the district court's finding that the testimony would impermissibly invade the province of the jury.

In summary, we hold Pepper did not sufficiently proffer Dr. Parker's testimony to enable appellate review. The issue is not preserved.

22

*Pepper was not prejudiced by the presence of one camera in pretrial and trial proceedings.*

Pepper's third argument on appeal is that the district court erred in allowing one camera in the courtroom to record pretrial and trial proceedings. The State replies that Pepper does not establish there was a camera in the courtroom during trial and, even if there were a camera, Pepper does not demonstrate the camera's presence was prejudicial. Pepper's objections to camera coverage were raised below, so they are preserved for appeal. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019) ("Litigants generally are precluded from raising an issue on appeal when they failed to raise the issue in the district court.").

*Standard of Review*

"Where a trial court permits photographic, audio, and television reproduction of the trial proceedings, the defendant has the burden to prove prejudice by showing that media coverage prevented the defendant from presenting his or her defense or in some way affected the ability of the jury to judge defendant fairly." *State v. Ji,* 251 Kan. 3, 32, 832 P.2d 1176 (1992).

*Analysis*

In *State v. McNaught,* we explained the competing interests that inform considerations about cameras in courtrooms:

> "Generally speaking, the propriety of granting or denying permission to the media to broadcast, record, or photograph court proceedings involves weighing the constitutional guaranties of freedom of the press and the right to a public trial on the one

hand and, on the other hand, the due process rights of the defendant and the power of the courts to control their proceedings in order to permit the fair and impartial administration of justice." *State v. McNaught*, 238 Kan. 567, 574, 713 P.2d 457 (1986).

The right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. *State v. Albano*, 313 Kan. 638, 644, 487 P.3d 750 (2021). "The concept of a public trial implies that doors of the courtroom be kept open and that the public, or such portion thereof as may be conveniently accommodated, be admitted, subject to the right of the court to exclude objectionable characters." *State v. Galloway*, 311 Kan. 238, 250, 459 P.3d 195 (2020). This right, however, "is primarily for the benefit of the defendant" and "does not entitle the press to broadcast, record, or photograph court proceedings." *McNaught,* 238 Kan. at 574.

The second consideration, the defendant's due process rights, was at issue in *Chandler v. Florida*, 449 U.S. 560, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981). The Court concluded that cameras in the courtroom do not amount to a per se due process violation. *McNaught*, 238 Kan. at 574. That said, a due process violation may occur depending on the factual circumstances. 238 Kan. at 574. In *McNaught*, we outlined several factors to consider when making this determination: "the location of the broadcast or photographic equipment in the courtroom; the degree of distraction or disruption, if any, caused by the presence; and the effect of the presence and use of such equipment on the defendant's ability to present his case." *McNaught,* 238 Kan. at 575.

On appeal, Pepper argues the camera impacted his right to a fair trial in several ways. Before we get to that, we must first address the State's argument that there is no evidence in the record to establish the existence of cameras at all. The State is correct that it is Pepper's burden to designate a record showing reversible error. *State v. Nguyen*, 285 Kan. 418, 430, 172 P.3d 1165 (2007). The State is also correct that, on appeal, Pepper

24

does not direct us to any portion of the record where defense counsel conveyed the camera was in the courtroom during trial.

But during a pretrial hearing, defense counsel asserted Pepper had been videotaped in prison garb while remotely making his first appearance before the court on a video screen. Neither the prosecutor nor the judge refuted that assertion. So we find there is sufficient evidence that Pepper was videotaped during his first appearance while he was wearing prison garb.

And following jury selection, the court told the jury: "Don't be concerned about being photographed or videotaped during the trial. The law, court rules prohibit media from doing that in any way which would allow you to be identified." This statement appears to reference Supreme Court Rule 1001(e)(6), which provides that the media may record proceedings in Kansas courts with permission but may not do so in a way that allows for juror identification. Supreme Court Rule 1001(e)(6) (2023 Kan. S. Ct. R. at 651). In context, it makes no sense for the court to make this statement if there had been no cameras in the courtroom during the trial. So we hold the record sufficiently reflects the presence of a camera during Pepper's first appearance and trial.

Pepper suggests the camera impacted the trial because "witnesses would have been aware that their testimony was reaching a possibly very large audience." He argues that the camera "in the courtroom *could* have influenced the jurors or witnesses" and that "witnesses *may* be more nervous testifying in front of a camera, and *may* not testify as openly knowing there is a far broader audience than the people present in the courtroom." (Emphases added.) But Pepper cannot point to a single witness whose testimony was affected by the camera's presence. See *State v. Viurquez*, No. 88,653, 2003 WL 27393652, at *2-4 (Kan. App. 2003) (unpublished opinion) (rejecting a *McNaught* challenge related to defendant's testimony because, among other things, defendant was

not overtaken by nervousness or hesitation while testifying). In fact, the phrasing of his statement belies the speculative nature of his argument. Without evidence of witness influence by the camera, we need not address prejudice. This argument has no merit.

Next, Pepper argues "it was possible that [Pepper] was recorded while sitting with counsel at the defense table." The phrasing of this argument also shows it is speculative. Though we have already inferred the existence of a camera in the courtroom because of general statements referring to a camera, we cannot also infer specifically what the camera captured while Pepper was seated with his counsel at the defense table. We only know it is "possible." Without citing to the record where Pepper is on camera sitting at counsel table, it is only speculation. This argument also fails.

Finally, Pepper argues that the recording of him in a jumpsuit at his first appearance could have been seen by individuals who later became jurors. See *State v. Alston*, 256 Kan. 571, 580, 887 P.2d 681 (1994) ("We have noted that adverse pretrial publicity may endanger the ability of a defendant to receive a fair trial in situations where prospective jurors read or hear the adverse publicity and are affected in their judgment should they later sit as jurors."). Though the court granted Pepper's motion to wear civilian clothing in the pretrial and trial proceedings, Pepper suggests the footage of him at his first appearance shows prejudice had already occurred.

In *State v. Hall*, 220 Kan. 712, 714-15, 556 P.2d 413 (1976), we explained that "requiring an accused to stand trial in distinctive prison clothing . . . may result in an unfair trial and may deny the prisoner the presumption of innocence . . . ." But we also observed "the appearance of an accused in prison garb at a trial or some portion thereof, does not in and of itself constitute reversible error. It must be shown that the accused was prejudiced by such appearance in that such appearance resulted in an unfair trial." *Hall*, 220 Kan. at 715. In *Hall*, the defendant briefly wore prison attire but then wore civilian

clothes during voir dire questioning and the remainder of the trial proceedings. We found there was no prejudice because the record did not reveal any jurors knew the defendant's initial clothing was prison attire. 220 Kan. at 715.

Here, while there is evidence Pepper was videotaped wearing prison clothing, there is no evidence his jurors were aware of it. During voir dire, the prosecutor asked the potential jurors whether anyone had heard about the case. One potential juror indicated she had heard about it in the media but did not elaborate. The prosecutor then asked if anyone else had encountered Pepper's case in the media, and no other potential jurors said they had. The potential juror who responded was struck and did not sit on Pepper's jury, meaning the only person who may have come across a prior media report with footage of Pepper wearing prison attire did not determine his guilt. Consequently, Pepper has not presented any "evidence that any individual juror's ability to judge the defendant fairly was influenced by media coverage prior to trial." *McNaught*, 238 Kan. at 576.

Again, without evidence any member of the jury saw Pepper in prison clothing, he has no evidence upon which he could claim prejudice. Pepper has no basis to prove prejudice from what might not have happened. Pepper also suggests that jurors may not have admitted to seeing his first appearance video during voir dire, but this is entirely speculative. This argument also has no merit.

We conclude Pepper fails to show he was prejudiced by the camera and, therefore, the district court did not err.

Affirmed.

27