NOT DESIGNATED FOR PUBLICATION

No. 126,423

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GABRIEL D. YANKEY JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; FAITH JOHNSON, judge. Oral argument held November 12, 2024. Opinion filed August 8, 2025. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ATCHESON, P.J., CLINE and PICKERING, JJ.

ATCHESON, J.: A jury sitting in Sedgwick County District Court found Defendant Gabriel D. Yankey Jr. guilty of multiple felonies and a misdemeanor when he forced his way into the home where his young son and the child's mother lived. Yankey represented himself leading up to and during the three-day trial. With the assistance of a lawyer on appeal, he principally complains that he wore jail clothing—an orange jumpsuit—throughout the trial. Well before the trial, the district court informed Yankey that he could wear civilian clothes in front of the jury. But Yankey waited until the morning of

1

trial to explain he had no one to bring him clothing. Under those unusual circumstances, we find no error in the district court's decision against delaying the trial.

Yankey otherwise complains that the district court should have instructed the jurors to disregard his appearance in a jail uniform and should have allowed them to consider a charge of simple assault as a lesser included offense of aggravated assault. But Yankey lodged no objection on those points, and neither omission amounted to clear error. We, therefore, affirm the guilty verdicts and resulting sentences.

FACTUAL AND PROCEDURAL HISTORY

Yankey and A.T. are parents to a son who was about six years old at the time of the incident resulting in the criminal charges. A.T. lived in one half of a Wichita duplex with the boy and her 12-year-old daughter from another relationship. Yankey and A.T. never married and had no formalized visitation schedule, although she permitted him to see their son on a regular basis.

In March 2019, Yankey told A.T. he was coming over ostensibly to pick up a fan he had left at the duplex. A.T. wasn't pleased, so she decided to put the fan on the porch where Yankey could retrieve it without coming inside. When A.T. stepped outside, Yankey suddenly appeared with a baseball bat in one hand and barged into the duplex. He then grabbed A.T.'s arm and pushed her downstairs to her bedroom in the basement. At trial, A.T. testified that Yankey then threatened to kill her and railed about not letting any other men around his son. According to A.T., he swung the bat and struck the door frame. A.T.'s daughter was sufficiently alarmed by raised voices coming from the basement—although she couldn't tell what her mother and Yankey were saying—that she went to the house across the street and asked the neighbor to call the police. The woman did so. At the trial, she described the girl as visibly upset and told the jurors she saw Yankey leaving the duplex with a baseball bat.

2

Immediately after Yankey left, A.T. also called 911. Several Wichita police officers responded. They did not see or document any damage to the door frame. One officer watched a neighbor's security camera video and testified at trial that the recording showed Yankey carrying a baseball bat when he arrived at the duplex and when he left.

The State charged Yankey with aggravated burglary, aggravated assault, and criminal threat—all felonies—and domestic battery, a misdemeanor. For reasons that are not pertinent to this appeal, the case did not go to trial until the second week of January 2023. The district court granted Yankey's motion to represent himself on December 19, 2022, and did not appoint a standby lawyer.

Six days before trial, the district court held a "status conference" with Yankey and the prosecutor. Toward the end of the conference, the district court asked Yankey if he had clothes to wear for the trial. He responded, "I would like to not be in orange [but] I just don't know how I could get access to" other clothing. The district court then explained that "typically" family or friends bring civilian clothing to the jail ahead of the trial, and the defendant is permitted to "dress out"—to put on those clothes before coming into the courtroom. The district court also told Yankey that he would be seated at counsel table without shackles before the jurors entered and would remain there until the jurors left. The district court described all of that maneuvering as part of a deliberate plan to ensure that Yankey would have a fair trial. After detailing that process, the district court asked Yankey if he had "any other questions." He told the district court he did not.

The morning of trial, security officers brought Yankey into the courtroom in his orange jumpsuit before the prospective jurors arrived for voir dire. Yankey then launched into what looks to have been a concerted effort to delay or otherwise derail the trial at the literal last minute. First, Yankey discursively described an action he asserted he had filed in federal court against some state court judges alleging they had deprived him of his constitutional rights. His rambling recitation was inscrutable as to the causes of action,

3

the named defendants, and the status of the case. Yankey did not say he had sued the judge presiding over his trial. Rather, he argued she had an apparent conflict of interest and should recuse herself for that reason. Yankey's representations mirrored a written motion he had filed a day earlier.

The district court judge told Yankey she was unaware of the federal action until he had raised it that morning. Under the circumstances, the district court declined to step off the case. Yankey did not then follow the procedure in K.S.A. 20-311d(d) to have the chief judge of the district review that ruling, and he has not argued the denial of his motion as a point on appeal. We see no colorable basis for recusal in Yankey's disjointed oral and written arguments to the district court.

After the district court denied that motion, Yankey argued that he had insufficient time to prepare for trial and was not ready to go forward, although the trial date had been set in late November 2022. He said forcing him to go to trial violated his constitutional rights. Yankey neither outlined what additional preparation he needed to do nor suggested how long it would take.

When Yankey filed his one-page motion for self-representation on December 8, 2022, he did not request a continuance of the trial. Another district court judge heard the motion on December 19 and entered a written order the next day granting Yankey's request. The order retained the January 10 trial date. The appellate record does not include a transcript of the December 19 hearing. Yankey's day-of-trial motion for a continuance fell within the district court's broad discretion in managing its docket in a reasonable way—an especially deferential standard. See *State v. Lewis*, 299 Kan. 828, 846, 326 P.3d 387 (2014). Yankey has not asserted the denial of his requested continuance as an error on appeal.

The prosecutor then pointed out that Yankey was shackled and wearing a jail uniform. The district court asked Yankey if he wanted the shackles removed. He replied, "It doesn't matter to me." But he immediately added, "[A]s far as I am concerned, it's a due process violation . . . that I'm even in these clothes." The district court reminded him of the discussion they had at the status conference about civilian clothing. Yankey informed the district court he had no one to bring him civilian clothing. The district court told the security officers Yankey should not be shackled in the presence of the jurors but did nothing further to obtain civilian clothing for him. Strictly speaking, Yankey requested no relief from the district court regarding his clothing, although we do not rest our ruling on this point on that sort of technicality. We defer our legal analysis since Yankey had made this a crux of his appeal.

The district court then had the prospective jurors brought into the courtroom. During the jury selection process, the prosecutor asked if any of the prospective jurors had "an issue with what Mr. Yankey is wearing." The prosecutor identified three individuals who responded in some inaudible way, presumably by raising their hands, but he didn't ask them any follow-up questions. Yankey also brought up his clothing, prompting responses from several prospective jurors, including the three the prosecutor noted. A couple of them told Yankey that he should be able to look presentable if he were representing himself. Another voiced a similar comment and added, "[Y]ou should be able to be dressed at least in something that doesn't look like you are already sentenced." Several of them told Yankey his clothing would not cause them to lean against him, although they did not elaborate on their thinking. Of the prospective jurors commenting on Yankey's clothing, only one was seated on the jury; she said, "[Y]ou deserve to be able to dress appropriate for court, if you were given access to it—or should be given access to it." The tenor of the remarks indicated those prospective jurors disclaimed any prejudice toward Yankey because he was wearing a jail uniform, and some suggested a sense he may not have been allowed to wear civilian clothes.

5

While the potential jurors were out of the courtroom during the afternoon recess, Yankey asked the district court to appoint a standby lawyer for him. Over the course of the case, Yankey had gone through several appointed lawyers. The district court offered to appoint the lawyer who had most recently represented him to be standby counsel, if he were available. But the district court told Yankey he could not have a new lawyer unfamiliar with the case. Yankey briefly restated why he was dissatisfied with his last lawyer and requested another lawyer by name.

As the prosecutor and Yankey exercised their peremptory challenges to cull the jury panel, Yankey asked the district court to contact his most recent appointed lawyer to find out if he would act as standby counsel. The district court agreed to do so. The district court then had the prospective jurors return, identified those chosen to serve on the jury, and recessed for the day. During the morning recess the next day, the district court informed Yankey that his former lawyer reported he had appearances in other cases and, therefore, could not be standby counsel. On appeal, Yankey has not raised the denial of his request for a standby lawyer. Although a criminal defendant's eleventh-hour request implicates constitutional rights, a district court has wide latitude to rule in a manner that does not disrupt the orderly progression of the imminent jury trial. See *State v. Kemmerly*, 319 Kan. 91, 101, 552 P.3d 1244 (2024). We elaborate on this point in analyzing Yankey's appellate argument challenging his appearance at trial in a jail uniform because the two implicate analogous constitutional considerations.

At the start of the second day of trial before the jurors had come into the courtroom, Yankey made an oral motion to exclude A.T. as a witness because she had been diagnosed with bipolar disorder and manic depression. He argued those conditions rendered her incompetent to testify and required all of her out-of-court statements be excluded as evidence. The district court denied the motion on the grounds those diagnoses do not legally disqualify someone from testifying. See K.S.A. 60-407 (individual presumed competent to testify); K.S.A. 60-417 (individual incompetent to

testify if unable to understand and appreciate oath to tell truth). Again, Yankey has not asserted error in that ruling on appeal.

During the three-day trial, the State called A.T., her daughter, the neighbor from across the street, and two police officers as witnesses and presented various exhibits. Yankey did not testify in his own defense. The jury convicted Yankey on all of the charges against him. The district court later sentenced Yankey to a controlling prison term of 60 months with postrelease supervision for 36 months, reflecting a presumptive guidelines sentence. Yankey has appealed.

LEGAL ANALYSIS

On appeal, Yankey raises three substantive issues: (1) his appearance during the jury trial in the prison uniform; (2) the district court's failure to affirmatively instruct the jurors to disregard his clothing; and (3) the failure to instruct the jurors to consider simple assault as a lesser included offense of the aggravated assault charge. He also asserts the cumulative effect of those ostensible errors deprived him of a fair trial.

*Appearing in Jail Uniform*

Criminal defendants have a well-established constitutional right not to be compelled to appear in jail clothing during jury trials. *Estelle v. Williams*, 425 U.S. 501, 512-13, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); *State v. Ward*, 292 Kan. 541, 570-71, 576, 256 P.3d 801 (2011); *State v. Hall*, 220 Kan. 712, 714-15, 556 P.2d 413 (1976). The appearance corrodes the presumption of innocence, due process protections, and the right to jury trial itself. *Estelle*, 425 U.S. at 503-04; *Ward*, 292 Kan. at 570-71; *Hall*, 220 Kan. at 714-15 (recognizing federal due process protections and presumption of innocence secured in both United States Constitution and Kansas Constitution). Courts have ascribed various pernicious inferences jurors may draw from a defendant's appearance in

a jail uniform. Jurors may suspect the defendant was denied or unable to post bail because they are considered too dangerous or have bad criminal records. See *Morgan v. State*, No. 109,099, 2014 WL 5609935, at *5-6 (Kan. App. 2014) (unpublished opinion). As one prospective juror intimated here, a defendant could be dressed that way because they are serving a prison sentence imposed in another case. And a defendant's credibility may be diminished if they wear jail garb as they testify during the trial. *Estelle*, 425 U.S. at 519 (Brennan, J., dissenting); cf. *Ward*, 292 Kan. at 573-74 (noting cases recognizing credibility of defense witnesses may be diminished if they testify wearing jail clothing, shackles, or both). Moreover, the practice implicates equal protection rights because it would necessarily fall disproportionately upon poor defendants who cannot afford to post bail. *Estelle*, 425 U.S. at 505-06.

Given the fundamental rights at stake, district courts have an obligation to scrupulously avoid having jurors or potential jurors inadvertently see a criminal defendant in jail clothing. Conversely, a defendant could choose to appear at trial dressed that way, and the *Estelle* Court suggested doing so was a recognized, though infrequent, strategy designed to evoke sympathy. 425 U.S. at 508.

Compelling an unwilling defendant to wear a jail uniform during trial has not been treated as a structural error requiring reversal of a conviction without a showing of prejudice. Rather, the error may be considered harmless in some circumstances. *Hall*, 220 Kan. 712, Syl. ¶ 2 (defendant appearing in front of jury in jail uniform must show actual prejudice resulting in unfair trial); *Steen v. Schmalenberger*, 687 F.3d 1060, 1063-64 (8th Cir. 2012); *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006); 3B Wright & Miller, Federal Practice and Procedure: Criminal 4th § 855; 21A Am. Jur. 2d Criminal Law § 921.

Here, the jail clothing issue cannot be divorced from Yankey's decision to represent himself. A byproduct of self-representation for a pretrial detainee is arranging

to get civilian clothes for a trial—a task a lawyer would typically handle. The district court raised the point with Yankey at the pretrial conference and explained to him the usual way of getting civilian clothing. The hearing transcript shows Yankey to have been actively engaged in the overall process, so he wasn't reticent in offering his views. But he did not suggest to the district court that he would be unable to have family or friends bring clothing for him to the jail.

The morning of trial, with prospective jurors and presumably the State's witnesses at the ready, Yankey unleashed his sequential attack to undermine the proceedings and to force a delay. As we have outlined, Yankey first complained the district court should step off the case, requiring reassignment of the trial. Having failed on that front, Yankey asserted he wasn't prepared to go forward. Again rebuffed, Yankey noted the due process implications of his wearing the jail uniform in front of the jurors. During jury selection, Yankey then requested a standby lawyer for the duration of the trial. And finally, the next morning, Yankey moved to exclude the testimony of and any out-of-court statements from A.T.

Yankey's complaint about his attire came sandwiched amidst four other arguments he aimed at disrupting the trial and forestalling any verdict. He has appealed none of the other adverse rulings. We, of course, recognize that an otherwise sound legal argument is no less so because it has been surrounded by meritless claims. As we have indicated, we find Yankey's complaint about the jail uniform and his request for a standby lawyer to be analytically analogous, especially against the factual tableaux here. Each presents a cleanly defined legal question touching on comparable constitutional fair-trial rights accorded criminal defendants. And the developed caselaw on late requests for standby lawyers supplies an informed breadth and depth to otherwise sparce authority on jail attire going beyond the general rule to the unusual circumstances we confront. So we turn to that authority for guidance.

9

Had the district court granted Yankey's request, the trial would have been delayed for appointment of a standby lawyer and to allow them to become passably familiar with the case, a necessity even for someone serving in that limited capacity. See *Kemmerly*, 319 Kan. at 101 (recognizing appointment of lawyer as standby counsel or to fully represent defendant who wished to rescind decision to self-represent would necessitate delay of weeks); *State v. Rassel*, No. 107,336, 2013 WL 1688930, at *2 (Kan. App. 2013) (unpublished opinion) (discussing role of standby lawyer for criminal defendant). When a defendant who has elected to self-represent then asks for a lawyer at the start of a trial, the district court has the discretion to deny the request, especially if it appears to be an attempt to manipulate the process or otherwise suggests bad faith. *Kemmerly*, 319 Kan. at 100-01; *State v. Collins*, 257 Kan. 408, 415-16, 893 P.2d 217 (1995) (request to discharge lawyer and self-represent); *United States v. Leveto*, 540 F.3d 200, 209-10 (3d Cir. 2008); see *Rassel*, 2013 WL 1688930, at *2-3. The district court must balance the disruption and delay of the trial against possible prejudice to the defendant. *Kemmerly*, 319 Kan. at 100; *Collins*, 257 Kan. at 415. The district court's decision, of course, implicates a criminal defendant's right to counsel protected in the Sixth Amendment to the United States Constitution. Nonetheless, appellate courts review a decision to deny a standby lawyer for abuse of judicial discretion. *Kemmerly*, 319 Kan. at 101.

In applying that standard, we require the party challenging the ruling to show that the district court ignored either controlling facts or the governing legal framework or otherwise reached a result beyond the pale of reasonable judicial decision-making. *State v. Shields*, 315 Kan. 131, 142, 504 P.3d 1061 (2022) (reciting standard); *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018) (burden on party challenging ruling). As we have pointed out, Yankey does not contend the district court erred in denying his request for a standby lawyer. We have recognized no abuse of discretion when a district court has denied a request in similar circumstances. *State v. Collins*, No. 116,651, 2018 WL 1247048, at *11 (Kan. App. 2018) (unpublished opinion) (district court did not abuse discretion in denying self-represented defendant's request for standby counsel made on

10

morning of trial); *Rassel*, 2013 WL 1688930, at *3 ("[A] criminal defendant may not change positions on self-representation in bad faith or in a way that materially disrupts judicial proceedings. See *John-Charles v. California*, 646 F.3d 1243, 1250 [9th Cir. 2011] [no error in denying defendant's request made in the middle of trial to rescind waiver of counsel]; *United States v. Leveto*, 540 F.3d 200, 207 [3d Cir. 2008] [suggesting no abuse of discretion in denying defendant's request for counsel on the day of trial after granting an earlier motion for self-representation].").[1]

[1] Both *Kemmerly* and *Collins* involved requests made after a jury trial had begun, and *Collins* casts its ruling as one addressing a request during trial, 257 Kan. 408, Syl. ¶ 3. We see no basis for distinguishing the circumstances here. Yankey made his request during the jury selection process. One could argue a criminal jury trial does not technically "begin" until jeopardy attaches when the jury has been selected and sworn. See *State v. Roberts*, 293 Kan. 29, 37, 259 P.3d 691 (2011). But that would be quibbling, given the issue at hand. Moreover, in *Kemmerly*, the court cites *Leveto* as persuasive authority. *Kemmerly*, 319 Kan. at 101. There, Leveto sought to rescind his decision to self-represent the morning of trial before jury selection had started. *Leveto*, 540 F.3d at 205.

On this record, Yankey's objection to wearing his jail uniform is of a piece with his request for a standby lawyer. Both look like interjections designed to delay the trial with the jail clothing issue serving as Plan C, after the district court rejected Yankey's request to step off the case and then to continue the trial. And both involve constitutional rights tied to criminal jury trials. But they were interposed at the last possible opportunity before the start of the trial. In those circumstances, the same legal standard governs. That is, the district court's ruling on Yankey's objection to appearing in jail clothing was a matter of judicial discretion implicating management of the trial weighed against some degree of prejudice. Given that standard, we cannot say the district court abused its exceptionally broad authority.

As we have said, a district court violates a criminal defendant's constitutional rights by compelling the defendant to appear during a jury trial in identifiable jail

11

clothing. But the protection is not absolute and may be waived or forfeited. See *Estelle*, 425 U.S. at 508-10. And a defendant may sacrifice the right through their own conduct.

As we have explained, Yankey created the predicament he then appeared to be exploiting the morning of trial when he declined to inform the district court during the conference a week earlier that he had no one to bring him civilian clothes. As we have outlined, the district court specifically told Yankey he could wear civilian clothing and described the usual process for getting clothing to the jail. Yankey didn't speak up. Had he done so, the district court could have considered other options for getting him civilian clothes. For example, the district court might have enlisted a third party to go to Yankey's residence to pick up appropriate clothing. Or the district court could have contacted the local public defender's office to see if it had a clothing bank for its clients. There may have been other ways of getting civilian clothes for Yankey a week before the trial. It is not our business here to explore and catalogue every potential solution to the problem. But Yankey thwarted any possible solution by failing to identify the problem in a timely way. Had Yankey told the district court during the hearing about the obstacle he faced in securing civilian clothing and then been thoroughly rebuffed, we would have a different case now.

The morning of trial, any of the possible fixes would have delayed the proceedings for a measurable period without a guarantee of success. Yankey offered no ideas for promptly getting appropriate civilian clothing and simply complained about appearing in the jail uniform. Looking at the overall circumstances, we are not persuaded the district court compelled Yankey to wear jail clothing. So there is no error to be rectified on appeal.

To be sure, the district court could have chosen to delay the trial for some indeterminate time to hunt around for civilian clothing for Yankey. Especially given Yankey's seemingly studied silence during the pretrial conference—behavior that would

be viewed as unprofessional sandbagging or worse on the part of a lawyer—the district court had no obligation to do more. See *Puckett v. United States*, 556 U.S. 129, 134, 129 S. Ct. 1423, 173 L. Ed. 2d 266 (2009) (litigant engages in "sandbagging" court by "remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor"); KRPC 3.3 comment 3 (2025 Kan. S. Ct. R. at 384) ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation[,]" thereby demonstrating a lack of candor to the tribunal.). The district court weighed the competing considerations and chose to go ahead without delay. In doing so, the district court appeared to understand the law and was cognizant of the factual backdrop. We find no abuse of discretion in the district court's call made the morning of trial.

*No Limiting Instruction*

As a separate issue on appeal, Yankey contends the district court erred in failing to instruct the jurors to disregard his jail clothing during their deliberations in reaching verdicts on the charges. We assume the usual framework for assessing claimed instructional error applies. An appellate court considers: (1) preservation of the issue in the district court; (2) the legal appropriateness of the instruction; (3) the factual basis for giving the instruction; and (4) whether any error may be considered harmless under the circumstances. *State v. Barnes*, 320 Kan. 147, 172-73, 563 P.3d 1255 (2025).

Yankey did not ask for a limiting instruction about his appearance in a jail uniform, so the issue was not preserved in the district court. But we may review an unpreserved claim of instructional error, and we will grant relief if the district court's failure to give an appropriate instruction was clearly erroneous. *State v. Willis*, 319 Kan. 663, 671, 557 P.3d 424 (2024). A limiting instruction would have been legally appropriate since Yankey's attire was not something the jurors should have considered in their deliberations. And it obviously would have been factually supported.

13

We suppose the district court's failure to give a limiting instruction amounted to error. But that's not necessarily obvious. A party disadvantaged by something during a trial might not want the district court to instruct the jurors about it because an instruction would highlight the matter. See *State v. Rinck*, 256 Kan. 848, 853, 888 P.2d 845 (1995); *State v. Smith*, No. 125,463, 2024 WL 2552537, at *3 (Kan. App. 2024) (unpublished opinion); *State v. Perales*, No. 119,815, 2019 WL 5089857, at *13 (Kan. App. 2015) (unpublished opinion) (Atcheson, J., concurring) ("Often, good trial strategy suggests forgoing a limiting instruction that necessarily calls attention to the evidence in preference for the camouflage of silence."). Here, of course, Yankey's presence throughout the trial in a jail uniform wouldn't have escaped notice. Still, finer trial tacticians than we might perceive sound reasons to decline an instruction in this uncommon situation.

The better practice would have been for the district court to ask Yankey on the record if he wanted a limiting instruction and what it might say. See K.S.A. 60-406 (district court "upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"). The *Ward* court recognized that a district court should "consider giving" a limiting instruction if a defendant or witness appears during the trial in a jail uniform, while acknowledging an instruction "may not be advisable" in some cases. 292 Kan. at 576; see *State v. Jilka*, No. 115,274, 2017 WL 1367052, at *7-8 (Kan. App. 2017) (unpublished opinion) (Atcheson, J., concurring) (district court should ask criminal defendant if they want otherwise proper limiting instruction).

On appeal, Yankey has not favored us with the language he believes should have been included in a limiting instruction. A sufficient instruction might be as simple as telling the jurors: "You must not draw any inferences from the way the defendant was dressed during the trial, and you should not consider his clothing in arriving at your verdict." That borrows directly from PIK Crim. 4th 51.080 (2022 Supp.), the instruction

14

used when a criminal defendant does not testify. Other (and perhaps better) language could be crafted.

In applying the clearly erroneous test, an appellate court asks whether it is firmly convinced the verdict would have been different had the instructional error not occurred, taking full account of the trial evidence. *State v. Reynolds*, 319 Kan. 1, 18, 552 P.3d 1 (2024). The same criterion for reversible error applies when the mistake implicates a defendant's constitutional rights, as it does here. 319 Kan. at 18-19 (citing *State v. Jarmon*, 308 Kan. 241, 244, 419 P.3d 591 [2018]). We now turn to that task and look at the trial evidence.

To convict Yankey on the aggravated assault charge, the State had to prove he placed A.T. in reasonable apprehension of immediate bodily harm and did so with a deadly weapon. K.S.A. 21-5412. A jury instruction outlined those elements and defined "deadly weapon" as "an instrument" that could be used to in a way "calculated or likely to produce death or serious bodily injury." In turn, aggravated assault furnished the predicate felony for the aggravated burglary charge. See K.S.A. 21-5807(b)(1)(A) (aggravated burglary includes unauthorized entry of occupied dwelling with intent to commit felony there).

Without belaboring the evidence, the State established that Yankey pushed his way into A.T.'s duplex while carrying a baseball bat. He then grabbed A.T. and directed her into the basement where—still holding the bat—he threatened to kill her. The loud voices from the basement sufficiently alarmed A.T.'s daughter that she went across the street and asked her neighbor to call the police. And Yankey left with the bat. That evidence was essentially uncontroverted at trial. In those circumstances, reasonable jurors could readily deduce that Yankey had not brought the baseball bat as a gift for his son or for some recreational purpose. They could likewise conclude that a baseball bat in the hands of most adults, including Yankey, met the definition of a deadly weapon. In short,

15

the evidence amply supported the aggravated assault and aggravated burglary charges. And A.T.'s account also established the lesser charges of criminal threat and domestic battery.

Yankey's dress during trial had no real bearing on the strength of that evidence. So a jury instruction *not* to consider Yankey's clothing would have had no direct effect on how the jurors viewed that evidence. Conversely, a limiting instruction informing jurors that they should consider admitted evidence only for a specific purpose when it might also be relevant to another, albeit impermissible, purpose would directly influence their deliberations.[2]

[2] For example, a testifying defendant who offered evidence of their credibility could be impeached with their convictions for crimes of dishonesty. K.S.A. 60-421. The defendant would be entitled to an instruction directing the jury to consider those convictions only as they might bear on credibility or truthfulness and for no other purpose. K.S.A. 60-406; see *State v. Denney*, 258 Kan. 437, 443, 905 P.2d 657 (1995). Without the instruction, the jurors might treat the convictions as impermissible propensity evidence showing the defendant to be a persistent and incorrigible lawbreaker.

Here, as is customary, the district court instructed the jurors that their verdicts "must be founded entirely upon the evidence admitted and the law as given in these instructions." PIK Crim. 4th 68.010. We presume jurors follow the instructions they are given. *State v. Gonzalez*, 307 Kan. 575, 595, 412 P.3d 968 (2018). Although that instruction did not mention, let alone focus on, Yankey's jail clothing, it necessarily guided the jurors away from considering his attire, since that was neither admitted evidence nor governing law.

Our conclusion that the failure to give a limiting instruction did not influence the verdicts is buttressed by the discussion during jury selection. Yankey's appearance in a jail uniform was thoroughly ventilated with the prospective jurors. None of them indicated a disposition against Yankey because of his clothing. And those who voiced

16

opinions generally seemed willing to excuse his dress. One of those prospective jurors wound up being selected. In sum, we are unpersuaded that a limiting instruction would have moved the jurors to find Yankey not guilty on any of the charges.

*Lesser Included Instruction on Aggravated Assault*

Yankey contends the district court erred when it failed to instruct the jury on misdemeanor simple assault as a lesser included offense of aggravated assault. The Kansas Supreme Court has held that if the evidence supports the elements of the charged offense, then there is a factual basis to instruct on an otherwise legally appropriate lesser offense. *State v. Lowe*, 317 Kan. 713, 720, 538 P.3d 1094 (2023). In *Lowe*, the State charged the defendant with aggravated assault for using a motor vehicle as a deadly weapon to threaten a pedestrian. Because the evidence necessarily established the elements of simple assault—aggravated assault is simple assault committed with a deadly weapon—the court held that the jury should have been instructed on simple assault and the district court erred in not doing so. The rationale and holding in *Lowe* are legally indistinguishable from the circumstances here. The district court, therefore, erred here as well.

But Yankey did not present and preserve this point in the district court, so we review the instructional omission for clear error. A party must state their objections to the district court's jury instructions clearly and precisely. *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015). Vague or general objections don't cut it. At the instruction conference, Yankey argued the jury should not be instructed on aggravated assault because the State failed to admit the deadly weapon—the baseball bat—as an exhibit during the trial. Yankey's objection was not to the instruction itself but to the sufficiency of the State's evidence, and he was effectively asking the district court for a judgment of acquittal on the aggravated assault charge. If Yankey's contention were well-taken (it's not), the district court still could have instructed the jury on simple assault. But Yankey

17

did not ask the district court for a simple assault instruction as a lesser included offense of an otherwise submissible aggravated assault charge.

On appeal, Yankey characterizes the evidence on the aggravated assault charge as thin principally because A.T. testified that he swung the bat in the basement, striking a door frame, but the investigating police officers found no corresponding damage. His characterization proves too little. The strike may have been a glancing one or the product of a swing with insufficient force to do any damage. But Yankey didn't have to swing the bat at all to be guilty of aggravated assault.

As we have outlined, the crime requires the defendant to place the victim in reasonable apprehension of bodily harm "[w]ith a deadly weapon." K.S.A. 21-5412(b)(1). Displaying what appears to be a deadly weapon is sufficient if coupled with a threat of immediate harm. The deadly weapon need not be brandished or in the case of a baseball bat actually swung. See *State v. Deutscher*, 225 Kan. 265, 270-71, 589 P.2 620 (1979) (construing comparable statutory language in predecessor to K.S.A. 21-5412); *State v. Collins*, No. 119,522, 2019 WL 2554096, at *2 (Kan. App. 2019) (unpublished opinion) ("A key objective of the aggravated assault statute lies in deterring conduct that would tend to frighten or terrorize the victim with what looks to be a deadly weapon."). Here, merely carrying the baseball bat while threatening to harm or kill A.T. would have been sufficient for a conviction. So Yankey has not persuaded us the jury would have convicted him of simple assault if the instruction had been given.

In a connected argument, Yankey contends his aggravated burglary conviction should be reversed because of his claimed instructional error on the aggravated assault charge. Yankey would have a point if we were to reverse his aggravated assault conviction because that crime served as the predicate felony for the aggravated burglary. But we have affirmed the aggravated assault conviction, so this challenge to the aggravated burglary conviction fails.

18

*Cumulative Error*

For his final point, Yankey argues that cumulative error in the district court deprived him of a fair trial. See *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019) (if multiple trial errors collectively render trial unfair, appellate court may reverse resulting convictions). But unpreserved instructional errors may not be considered in assessing cumulative prejudice. *State v. Waldschmidt*, 318 Kan. 633, Syl. ¶ 9, 546 P.3d 716 (2024). The district court erred in failing to instruct on simple assault, but Yankey did not preserve the error. Likewise, if the district court should have given a limiting instruction regarding Yankey's jail clothing, the error was not preserved. We have identified no other errors. Consistent with *Waldschmidt*, neither can be considered in assessing cumulative error. So the point fails.

Affirmed.

* * *

PICKERING, J., dissenting:  No one looks innocent dressed in a jailhouse jumpsuit. For the reasons expressed below, I respectfully dissent.

For three days, the jury sat and listened as Yankey, distinctively clothed in an orange jail jumpsuit—likely with the words "Sedgwick County Jail" printed on the back—presented his own defense. At no point did the district court attempt to correct the clothing or admonish the jury to ignore Yankey's attire or advise why Yankey was wearing the jail jumpsuit. These failures by the court infringed on Yankey's right to the presumption of innocence and his right to a fair trial—both guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution.

19

To summarize, at Yankey's pretrial conference, the district court told Yankey, who was in custody and being held in the Sedgwick County jail, that if he wanted to wear regular clothing at his trial instead of his jail jumpsuit, his family or friends should provide him with clothing. Before the start of trial, Yankey told the court that he did not have any family or friends who could assist him. He objected to having to wear the jail clothing and argued that proceeding with the trial while he wore jail clothing violated his due process rights.

Despite Yankey's objection, the district court did nothing to prevent tainting the jury upon seeing Yankey dressed in his jail jumpsuit, such as correcting his clothing. Instead, throughout the three-day trial, the jury saw Yankey dressed in jail clothing while arguing his own case and without any stand-by counsel. The district court did not justify to the jury why such prejudicial clothing was necessary, nor did the court provide an admonition or a curative instruction to the jury. I would therefore find that the district court abused its discretion. Applying the constitutional harmless error standard, the State cannot show beyond a reasonable doubt that Yankey's jail clothing did not influence the jury's verdict. Accordingly, I would reverse and remand for a new trial.

*The District Court Abused Its Discretion by Ignoring Caselaw that the Court Should Avoid Tainting the Jury by Seeing Yankey Dressed in Jail Clothing*

*Standard of review*

The district court abuses its discretion if the court's conclusion is either arbitrary, fanciful, or unreasonable; is based on an error of law; or "is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 570, 256 P.3d 801 (2011).

20

*The presumption of innocence is essential for a defendant to receive a fair trial.*

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). As such, a person "accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978). This principle is the basis for the presumption of innocence. 436 U.S. at 485. The presumption of innocence is repeated throughout Kansas caselaw. Most recently, the Kansas Supreme Court stated: "'Every criminal defendant has a constitutional right to the presumption of innocence.'" See *State v. Strong*, 317 Kan. 197, 207, 527 P.3d 548 (2023); K.S.A. 21-5108(b).

*There is a clear consensus that a jury seeing a defendant wearing jail clothes taints a trial.*

Our United States Supreme Court recognized that a defendant appearing at trial in jail clothes can impact the defendant's presumption of innocence and result in an unfair trial. The *Estelle* Court explained how "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment," thereby undermining the defendant's presumption of innocence. 425 U.S. at 504-05. Thus, "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 425 U.S. at 512. To do so is a due process violation. 425 U.S. at 513.

The same year that the United States Supreme Court issued *Estelle*, the Kansas Supreme Court held: "[R]equiring an accused to stand trial in distinctive prison clothing

21

. . . may result in an unfair trial and may deny the prisoner the presumption of innocence . . . ." *State v. Hall*, 220 Kan. 712, 714-15, 556 P.2d 413 (1976). There, the defendant appeared briefly in prison clothing before changing to civilian clothing. The record, however, did not indicate that the jury had seen Hall in prison clothing. Agreeing with the federal courts, the *Hall* court held:

> "[T]o compel a prisoner to stand trial in prison clothing, which is clearly identifiable to a jury such as clothing with numbering or lettering appearing thereon, constitutes a denial of the prisoner's right to the presumption of innocence as guaranteed by the due process clause of the United States Constitution.

> ". . . This practice, if it exists in Kansas, should be discontinued. [Citations omitted.]" 220 Kan. at 714-15.

Our Kansas courts have recognized the consensus in caselaw that a jury seeing a defendant in jail clothing taints the trial. In *Ward*, the defendant moved for a mistrial when the trial court allowed two individuals dressed in jail clothing to be identified as the defendant's associates. The motion was denied, and the defendant appealed. The *Ward* court reviewed several out-of-state cases where persons had appeared in court in jail clothing and noted those cases were "expressly or impliedly critical of the practice." 292 Kan. at 576. The *Ward* court agreed with this disapproval:

> "[G]iven the consensus in the case law that jail clothing taints a trial, a trial court almost always abuses its discretion . . . when it allows a defendant, witness, or nonwitness to be brought before a jury in jail clothing without an articulated justification explaining why it is necessary for the person to wear jail clothing and does not consider giving an admonition or instruction to the jury that it should not consider the clothing or the person's incarceration." 292 Kan. at 576.

The *Ward* court explained that a district court abuses its discretion when a "court does not take into account the legal principles that control its decision." 292 Kan. at 576.

As a result, "the case law, including decisions of the United States Supreme Court, indicate the trial court should avoid the taint of jail clothing on a trial. Ignoring this case law is an abuse of discretion." 292 Kan. at 576.

My reading of *Ward* differs from the majority opinion. In considering the district court's failure to give a curative instruction, the majority notes that "[t]he better practice would have been for the district court to ask Yankey on the record if he wanted a limiting instruction and what it might say." Slip op. at 14. As I read *Ward*, that is the *minimum* required of the district court. Again, *Ward* held it was an abuse of discretion for a defendant to be brought before a jury in jail clothing "without an articulated justification explaining why it is necessary" and without considering "an admonition or instruction to the jury that it should not consider the clothing or the person's incarceration." 292 Kan. at 576. In short, I read *Ward* to place the onus of giving an admonition on the district court unless the defendant requests otherwise. Quite the opposite occurred here:  Yankey, appearing on his own behalf—not the district court—asked the jury not to consider his jail clothes. I do not read *Ward* to require an admonition *only if* the defendant requests one from the court.

Having established the importance of the presumption of innocence and the district court's role in avoiding the taint of a jury seeing a defendant in jail clothing, let us review what took place at the pretrial conference and the trial.

*Yankey objects to having to wear his jailhouse jumpsuit in front of the jury.*

At Yankey's pretrial conference, the district court advised Yankey, a self-represented litigant, that he should access civilian clothing for the trial by asking his family or friends. The court—aware that Yankey had been in jail for five months and recently had been evaluated for competency—never confirmed with Yankey whether he had the means to wear civilian clothing. Nor did Yankey advise the court differently.

23

The following week, before the start of voir dire, the State noted that Yankey appeared in his jail clothing and was shackled. The district court asked Yankey if he wanted his shackles removed, to which Yankey replied, "It doesn't matter to me." Yankey then told the district court, "I mean, it's—as far as I'm concerned, it's a due process violation the fact that I'm even in these clothes." The district court reminded Yankey that he was told he could change for trial, and Yankey replied with, "Yeah, I don't have that. I don't have any contact with anybody, so . . . ." The court responded, "All right. Well, we will have the deputy remove the shackles, that way you can also take notes."

Here, Yankey did inform the district court that his appearance in his jail clothing was a due process violation and he did not have contact with anyone to bring him clothing. Towards the end of voir dire and without the jury being present, Yankey again raised the issue of his clothing with the district court. While the majority opinion seems to question whether Yankey objected to his jail attire, the record supports a finding that Yankey objected to appearing in his jail clothes and did not willingly wear jail clothes at his trial. See *Estelle*, 425 U.S. at 512-13.

Although Yankey could have informed the district court sooner that he lacked access to civilian clothes, nevertheless, he should not have been left with only one means of acquiring civilian clothes, i.e., relying on family or friends; more was required. As a reminder, Yankey had been held in custody for five months before the trial began— during which his competency was questioned. Being held in jail for such a long period would naturally isolate a defendant from family and friends. It is very likely that Yankey had continually appeared in court without any family or friends present in the courtroom.

For unclear reasons, the district court did not make any findings about Yankey's attire after Yankey told the court that he did not have contact with anyone who could bring him clothes. Instead, the district court continued with the trial without examining other means for Yankey to wear civilian clothes. As Yankey notes, despite other possible

24

avenues available within the Sedgwick County court system, e.g., three public defender offices, to acquire regular men's clothing, Yankey was not given a meaningful opportunity to access civilian clothing.

*The district court did not admonish the jury or provide an explanation for why Yankey appeared in jail clothing.*

Without any admonishment by the district court, the burden fell to Yankey. During closing arguments, Yankey told the jury to disregard his jail clothing. The district court should have followed Yankey's plea to the jury with a similar admonition to ignore Yankey's jail clothing—particularly after a seated juror had expressed negative views of his clothing during voir dire. Yet at no time did the district court provide an admonishment regarding Yankey's jail clothing. The district court also never articulated a justification to the jury for why Yankey appeared at trial in jail clothes.

An admonishment by the district court undoubtedly would have carried greater weight than a request by a jail inmate. Without the jury being told why Yankey was wearing a jailhouse jumpsuit, the jury was left to assume the worst. For instance, the jury may have assumed Yankey had committed more serious crimes in jail or was a security risk or attempted to escape and, thus, must remain in jail-identified clothing.

More problematic, the jury could have interpreted the district court's silence as a rejection of Yankey's plea to ignore his clothing when determining his guilt. In essence, despite Yankey's objection and later self-requested admonishment to the jury, the district court took no additional steps to safeguard Yankey's presumption of innocence. This is contrary to *Ward*, 292 Kan. at 576, and, thus, an abuse of discretion.

The State maintains that the district court did not abuse its discretion because it provided Yankey with notice of his ability to change clothes. That is, his inability to

25

access civilian clothing was merely a disadvantage of self-representation. The majority opinion agrees, stating that Yankey's actions were done to delay the trial. Slip op. at 11. On this, I am not persuaded.

This case had been pending for over three-and-a-half years. Yankey was charged on April 26, 2019, and the trial began on January 10, 2023. In August 2022, Yankey's bond was revoked, and Yankey had been in custody for five months when the trial started. During that time, Yankey had to wait another three months (August 2022 to November 2022) to determine his competency to stand for trial. The majority opinion points to the various motions that Yankey filed before the start of the trial as a delay tactic. Yet earlier in the case, Yankey's own defense counsel noted to the court the variety of motions Yankey had filed with the court. In fact, it is not uncommon for self-represented litigants to file several motions before the trial begins. Any delay in getting Yankey clothing would have been minuscule. As his brief notes, there were three public defender offices that would have been able to assist with clothing Yankey. Thus, the suggestion that Yankey's actions were done to delay his case even further is, at best, tenuous.

In light of the precedent established by *Ward*, the district court had a minimum obligation to reduce the taint of Yankey wearing jail clothes at trial. In fact, it is hard to imagine a scenario more appropriate for the *Ward* standard to apply.

Under the circumstances of this case, the district court's decision to allow Yankey to stand trial in his jail clothes without alternative means to acquire clothing or providing an admonition to the jury was an abuse of discretion. Having found that the district court abused its discretion, I would apply the constitutional harmless error standard.

*The State cannot prove beyond a reasonable doubt that the error did not affect the outcome of the trial.*

When, as here, an error infringes on a party's federal constitutional right, a court will declare a constitutional error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). Under the constitutional harmless error standard, the burden of demonstrating harmlessness is on the party benefiting from the error. *Ward*, 292 Kan. at 569. "The *Chapman* 'harmless beyond a reasonable doubt' threshold requires the highest level of certainty that the error did not affect the outcome." *Ward*, 292 Kan. at 564.

Applying the harmless error test requires resolving two main issues: (1) the impact of Yankey's attire on the jury, which occurred throughout the trial, beginning with voir dire, and (2) the weight of the evidence presented against Yankey at trial. The State cannot show beyond a reasonable doubt that Yankey's appearance in jail clothes at trial did not impact the outcome of his trial or did not affect the verdict in light of the entire record.

*Yankey's attire impacted the trial by tainting the jury's view of Yankey.*

Turning first to voir dire proceedings, the State asked potential jurors, "Does anybody here have an issue with what Mr. Yankey is wearing?" Three potential jurors raised their hand to show that they took issue with Yankey's clothing. Later in the State's questioning, one potential juror indicated that he had concerns about the disparity in appearance between the representative of the State being dressed in a suit while Yankey was dressed in jail clothes.

27

Because Yankey was representing himself, he was allowed to ask the potential jurors questions during voir dire. He asked if any potential jurors took issue with his clothing, to which one juror responded, "I think if you do represent yourself, you should be able to look representable." Another potential juror agreed: "[I]f you are going to be representing yourself, you should be able to be dressed at least into something that *doesn't look like you are already sentenced*." (Emphasis added.) One potential juror stated, "It bothers me. I feel like *you should have respect for the court of law* if you are going to represent yourself." (Emphasis added.) Another potential juror stated, "I agree with the gentleman. I think you should be able to dress appropriately for court," while another stated, "I'm in agreement with my colleagues, you deserve to be able to dress appropriate for court, if you were given access to it—or should be given access to it." In total, six potential jurors expressed some sort of concern over Yankey's attire. Of those six individuals, one was eventually seated on the jury—the potential juror who stated, "I'm in agreement with my colleagues, you deserve to be able to dress appropriate for court, if you were given access to it—or should be given access to it."

The substance of the juror's statement might suggest that she agreed with her peers (who had all expressed negative sentiment regarding Yankey's attire) and implies that she maintained a negative perception of Yankey's attire. It is highly likely, moreover, that hearing six potential jurors express disfavor of Yankey's jail clothes would have left a negative impression with those chosen to sit on the jury. Given the discussion about Yankey's jail clothing during voir dire and the jury's comments, providing an admonition was advisable; without the admonition, the jury would assume that it could consider Yankey's clothing and present confinement.

Kansas courts have found that a defendant is prejudiced *when* a jury sees the defendant in jail clothing. In *Hall*, for a brief period before the start of voir dire, the defendant wore prison clothing. Yet during voir dire and the trial itself, the defendant was dressed in civilian clothing. The *Hall* court explained that "[i]t must be shown that the

28

accused was prejudiced by such appearance in that such appearance resulted in an unfair trial." 220 Kan. at 715. Because the record did not reveal any jurors knew the defendant was initially dressed in prison clothing, the *Hall* court found there was no prejudice. 220 Kan. at 715.

Likewise, in *State v. Pepper*, 317 Kan. 770, 539 P.3d 203 (2023), the defendant argued that he was prejudiced by pretrial media video footage that showed him wearing prison clothing. During voir dire, a potential juror did recall seeing the media report, but that same person was struck from the jury and, therefore, never sat on the jury. The *Pepper* court concluded that, while there was evidence the defendant was videotaped wearing prison clothing, there was no evidence that the jurors had seen the video, and thus, the defendant in jail clothing. 317 Kan. at 790-91.

In sharp contrast to *Hall* and *Pepper*, here, the jury saw Yankey dressed in his orange jail jumpsuit throughout the entire three-day trial. What we can draw from this is clear: A jury witnessing a defendant wearing jailhouse clothing is highly prejudicial. See, e.g., *Estelle*, 425 U.S. at 504-05; *Hall*, 220 Kan. at 714-15.

*A recent study supports the finding that a jury viewing a defendant in jail clothing can negatively impact the verdict.*

The majority opinion notes the "sparce" legal authorities on this issue. Slip op. at 9. I agree. There is a 2024 study, however, which investigated the impact of a defendant's jail clothing on jury decision-making: Street et al., *The Cloak of Innocence: Perception of Attire in the Courtroom*, Journal of Police and Criminal Psychology (October 12, 2024). The results "revealed that defendant appearance and defendant traits had significant indirect effects on the relationship between attire and verdict." *Perception of Attire in the Courtroom*, p. 7.

29

Noting that a criminal defendant's attire was shown to influence a person's perception of the defendant, the study found that a defendant dressed in a prison jumpsuit versus a dress suit was seen as "more aggressive." *Perception of Attire in the Courtroom*, p. 6. This perceived aggressiveness resulted in defendants being found over five times more likely to receive a guilty verdict. *Perception of Attire in the Courtroom*, p. 6 ("[M]ock jurors in the prison garb conditions were 5.27 times more likely than mock jurors in the formal attire condition to render a guilty verdict than a not guilty verdict.").

The study also revealed that when mock jurors assumed that the defendant was in jail and did not have "a choice of what to wear[,]" a not guilty verdict was more likely to be rendered. *Perception of Attire in the Courtroom*, p. 8. This study illustrates why a district court should explain to the jury the reasons a defendant is wearing jail clothing. To this point, Yankey asserts that without family or friends' help, he did not appear to have a choice of wearing jail clothing and the district court never articulated a justification for why Yankey appeared at trial in jail clothes.

The prejudice here—increased because Yankey represented himself—was perceived by the potential jurors during voir dire. For instance, according to a jury panelist, Yankey's jail clothing showed no respect for the court. The jury did not see someone dressed formally, like the prosecutor, present Yankey's case. This observation was also reflected in the *Perception of Attire in the Courtroom* study. There, the mock juries rendered not guilty verdicts when a defendant wore a suit due to the impression that "(a) the defendant want[ed] to make a good impression for court, (b) the defendant want[ed] to appear presentable to reduce the chance of being found guilty, and (c) the defendant want[ed] to appear to be a respectable and professional citizen, not a criminal that would commit assault." *Perception of Attire in the Courtroom*, p. 8.

Instead, Yankey cross-examined the State's witnesses, including two law enforcement officers, and argued evidence to the jury while wearing a jailhouse jumpsuit.

30

Indeed, it is difficult to find Yankey's jail clothing not prejudicial when Yankey was presenting his case to the jury while advocating for his innocence. One can conclude that seeing Yankey dressed in his jail jumpsuit while representing himself negatively impacted the jury.

*The evidence against Yankey was not overwhelming.*

Of the witnesses who testified, only two (A.T. and her daughter, T.S.) were present in the house for the altercation with Yankey. Portions of A.T.'s testimony relevant to this analysis include her claim that she received concerning Facebook messages from Yankey's girlfriend. But those messages were not admitted into evidence. A.T. also claimed that Yankey had a wooden baseball bat, pushed A.T. to the ground, threatened to kill her, and swung the baseball bat at the door frame. A.T. estimated she was 3 or 4 feet from the door frame when Yankey hit it with the bat, but she "thought [she] was going to die." No photos of any damage to the door frame were admitted into evidence. A.T. also stated twice during her testimony that neither she nor Yankey were yelling at each other during the altercation.

T.S. testified that when Yankey arrived, she could not see or hear exactly what was going on, but she heard yelling. In addition to her main testimony about throwing a hoverboard at Yankey, T.S. said that she did not remember much about that night because it was a long time ago. But she did recall banging on her neighbor's door while crying and asking the neighbor to call the police. T.S. also testified that she did not see Yankey again after running out of the home.

None of the testimony from A.T.'s neighbor clearly established what occurred inside the home. But she did state that she saw Yankey leave the premises with a baseball bat and "some other object in his hand." The officer on scene that night stated on cross-examination that some items were "scattered around in the basement," but, otherwise, the

31

physical appearance of A.T.'s home did not suggest an altercation had occurred. The second officer testified that prior to trial he "vaguely, remember[ed] seeing a video. Without looking at the video—I remember somebody going to a car with a baseball bat, or exiting the car with a baseball bat and coming back with a baseball bat, I believe." This video was referenced multiple times throughout the trial but was never admitted into evidence.

Not surprisingly, the jury questioned whether it could consider the witnesses' statements referring to the video during deliberations. Jury question 2 stated: "If multiple witness[es] referenced the video that was not submitted into evidence, are we still allowed to use the video comments made in deliberation." Later, the jury again asked about the video that was not admitted into evidence and thus not available for their review. At trial, Sergeant Mains had testified about the video he reviewed while talking with a neighbor. In the jury's consideration of this testimony, jury question 5 read: "We would like to hear the readback from Sergeant [Mains] when he referenced the video he saw from [the neighbor's] porch." It also asked for a readback of Bill's testimony regarding the video. These questions are three of the five jury questions asked during the jury deliberations. The other questions were: "Can we get transcripts of the witnesses?" (question 1), and "Define physical contact stated in count 4." (question 3). These series of jury questions demonstrate that the evidence was not found to be overwhelming. Thus, the State cannot meet its burden to show that Yankey's jail clothing did not influence the verdict beyond a reasonable doubt.

In sum, it is not immediately clear that the evidence presented at trial overwhelmingly establishes Yankey is guilty of aggravated assault, aggravated burglary, criminal threat, or domestic violence. T.S.'s testimony contradicted A.T.'s testimony that she and Yankey were not yelling. Nor did the State admit any direct evidence that supported the testimony presented at trial, such as the surveillance video of Yankey with the baseball bat, the bat itself, photos of damage to A.T.'s door frame, or the Facebook

messages warning A.T. about her safety. And as noted by Yankey, the only evidence presented that would have met the elements for any of the offenses Yankey was charged with was A.T.'s testimony.

*Conclusion*

The district court abused its discretion by allowing Yankey to appear at trial in jail clothing without following *Ward* and taking the necessary steps to safeguard Yankey's presumption of innocence. Yankey's appearance in his jail jumpsuit, despite his objection or other means to acquire clothing, and without the court explaining to the jury why Yankey's attire was necessary and not providing the jury with an admonition or curative instruction that it should not consider the clothing or Yankey's incarceration—particularly with a seated juror who expressed a negative opinion of Yankey's attire during voir dire—was error. Under the constitutional harmless error standard, the State cannot meet its burden to show that Yankey's jail clothing did not influence the verdict beyond a reasonable doubt. See *Ward*, 292 Kan. at 578. Because the district court committed reversible error, I would reverse and remand for a new trial.